STATE OF NORTH CAROLINA v. TIMOTHY ALBERT HARRIS

No. 51A88

(Filed 7 September 1988)

**1. Homicide § 12.1— murder—indictment—short form—sufficient**
   An indictment for first degree murder which was in compliance with the short form authorized by N.C.G.S. § 15-144 was sufficient.

**2. Homicide § 12.1; Indictment and Warrant § 13— murder—premeditation and deliberation or felony murder—election not required**
   The trial court did not err in a murder prosecution by failing to require the State to elect either the theory of premeditation and deliberation or the theory of felony murder.

**3. Criminal Law § 15.1— murder—change of venue for pretrial publicity denied—no error**
   The trial court did not err in a murder and armed robbery prosecution by denying defendant's motion for a change of venue based on pretrial publicity where the articles complained of were factual and devoid of any prejudicial speculations or characterizations; and the record does not disclose that defendant exhausted his peremptory challenges or that any juror had prior knowledge of the case.

4. **Bills of Discovery § 6; Constitutional Law § 30— statement of defendant to jailer — substance provided before trial — identity of witness and circumstances not revealed — no error**

The trial court did not err in a prosecution for murder and armed robbery by refusing to require the State to reveal the name of a witness, to provide a copy of the witness's written statement to defendant prior to trial or to provide a description of the facts and circumstances surrounding the statements where a jailer gave a statement to an investigator recounting a conversation with defendant, the State provided defendant with the substance of his own remarks without identifying the witness or providing a written copy of the statement, and the State made the written statement available to defendant at trial. N.C.G.S. § 15A-903(a)(2); N.C.G.S. § 15A-903(f)(1); N.C.G.S. § 15A-904(a).

5. **Jury § 9— acquaintance of juror with witness — discovered after trial began — juror not removed**

The trial court did not abuse its discretion in a prosecution for murder and armed robbery by denying defendant's motion to withdraw a juror who was acquainted with a witness where the witness's name was not revealed during jury selection, the acquaintanceship was not apparent until the two were observed greeting one another at the courthouse, both the court and the defense attorney questioned the juror about his relationship with the State's witness, and the juror stated unequivocally that the acquaintance would not affect his ability to remain fair and impartial.

6. **Criminal Law § 135.7— murder — preliminary instructions on bifurcated trial — no error**

There was no prejudice in a murder prosecution where the court gave a preliminary pattern jury instruction that "however, prior to that time the only concern of the trial jury is to determine whether the defendant is guilty of the crime charged or of any lesser included offenses about which it is instructed." The purpose of the instruction was clearly to limit the jury during the first phase of the trial to consideration of issues bearing upon the guilt or innocence of the accused without concern as to sentencing issues and, at defendant's urging, the trial judge remedied the situation with a curative instruction.

7. **Criminal Law § 62— reference to polygraph test — mistrial denied — no error**

The trial court did not err in a prosecution for murder and armed robbery by failing to declare a mistrial after a State's witness testified that he had asked both defendant and an accomplice who testified for the State to take a polygraph test where the witness's statement was neutral on its face in that it did not reveal responses to the request to take the test or whether the test was given and the judge took appropriate action to prevent any improper inference by allowing defendant's cross-examination of the witness to address that concern and by giving a cautionary instruction. Moreover, although defendant argues that the court erred by prohibiting evidence of a voice stress test after the door had been opened to lie detector evidence, the trial court in fact indicated that it would permit such evidence and defendant made no attempt to elicit the evidence.

**8. Criminal Law § 43.4— murder—photograph of victim—properly admitted**

The trial court did not err in a prosecution for armed robbery and murder by admitting a color photograph of the victim's remains where the victim was found two and one-half weeks after the murder and the upper body had apparently been ravaged by animals. An investigator identified the photograph as a fair and accurate representation of the victim's body as it appeared at the crime scene and it therefore was admissible to illustrate the location and position of the body when found as well as to corroborate details of other testimony; furthermore, there was no issue of inflammatory repetition because the State introduced only one photograph of the body.

**9. Criminal Law § 86.4— murder—fight during competency evaluation—introduction not prejudicial**

There was no prejudice in a prosecution for armed robbery and murder where the court allowed the prosecutor to cross-examine defendant about a fight in which he was involved at Dorothea Dix Hospital during his competency evaluation. Although the evidence was not relevant to the issue of credibility, and the State made no attempt to present an alternative argument for admissibility under N.C.G.S. § 8C-1, Rule 404(b), there was no prejudice because the testimony revealed that the brief altercation was not a fist fight and that defendant had merely pushed another patient down as a means of defending himself when the man attacked him. N.C.G.S. § 8C-1, Rule 608(b); N.C.G.S. § 15A-1443(a).

**10. Homicide § 21.5— first degree murder—evidence sufficient**

The trial court did not err in a prosecution for armed robbery and first degree murder by denying defendant's motion to dismiss the charge of premeditated and deliberate murder where the evidence, viewed in the light most favorable to the State, showed a statement of violent intent by defendant well in advance of the murderous deeds; a distinct lack of provocation on the part of the victim; and a brutal killing involving multiple skull injuries, many of which were inflicted after the victim had already been felled and incapacitated.

**11. Criminal Law § 117.4— murder—special instruction on motive of accomplice denied—no error**

The trial court did not err in a prosecution for armed robbery and murder by denying defendant's request for a special instruction on the motive of an accomplice who testified for the State where the trial judge gave defendant wide latitude to develop his theory that the accomplice was motivated by economic deprivation to commit the murder and admonished the jury to examine the accomplice's testimony with the greatest of care and caution in light of the evidence that he was an accomplice and of his plea agreement with the State; moreover, the trial judge charged the jury upon the alternate theory that defendant and the accomplice were acting in concert and an instruction as to the accomplice's motive would have been harmful to defendant rather than helpful.

**12. Criminal Law § 113.7— murder—instruction on aiding and abetting not given —no error**

The trial court did not err in a prosecution for armed robbery and murder by refusing defendant's request for an instruction on aiding and abetting where defendant was not charged with aiding and abetting nor did the evidence support such a theory.

**13. Criminal Law § 138.14— robbery—sentencing—single aggravating factor outweighing two mitigating factors**

The trial court did not err when sentencing defendant for robbery with a dangerous weapon by determining that the single aggravating factor of prior convictions outweighed the two mitigating factors of physical condition and aiding in the apprehension of another felon. N.C.G.S. § 15A-1340.4(a)(1)o; N.C.G.S. § 15A-1340.4(a)(2)d and h.

APPEAL by defendant from judgments sentencing him to consecutive terms of life imprisonment for conviction of murder in the first degree and forty years for conviction of robbery with a dangerous weapon, said judgments imposed by *Tillery, J.,* at the 14 September 1987 session of Superior Court, CRAVEN County. Heard in the Supreme Court 12 May 1988.

*Lacy H. Thornburg, Attorney General, by Jane P. Gray, Special Deputy Attorney General, for the state.*

*Rudolph A. Ashton, III and Jerry D. Redfern for defendant.*

MARTIN, Justice.

Defendant brings forth twelve assignments of error with respect to his trial. For the reasons stated below, we hold that defendant received a fair trial free from prejudicial error.

The state's evidence tended to show the following:

On the evening of 5 April 1987 defendant and his housemate Eddie Neil patronized Jerry's Lounge, a bar on Old Cherry Point Highway near New Bern. Defendant and Neil soon became acquainted with another patron—the victim, Ernest Hardy. The men conversed while defendant and Hardy took turns buying rounds of drinks. Throughout the evening, Hardy watched the clock, stating that he had "a meeting down the road." Sometime after midnight defendant indicated that he was going to give Hardy a ride but would return to the bar shortly. Defendant, Neil, and Hardy then left. Half an hour later, defendant and Neil re-

turned. Defendant responded to inquiries as to Hardy's where-abouts by explaining that he had "taken him down the road to the Exxon." He further stated that Hardy had asked him to wait a few minutes and had gotten into a black Cadillac with two black men. Defendant said he got nervous and left. Defendant appeared calm during this explanation, although he expressed some concern as to whether he had done the right thing in leaving Hardy alone with the men. During defendant's explanations, Neil nodded in agreement but did not contribute anything.

On 8 April Hardy's sister filed a missing person's report with the Craven County Sheriff's Department. On 9 April Investigator David Arthur interviewed defendant and Neil about the case. Defendant told the story of Hardy's "meeting" at the Exxon while Neil quietly concurred. On 10 April defendant talked with Investigator Bob Brown, reiterating the story.

On 24 April Investigator Arthur met with Neil at Neil's request. Neil stated that defendant had killed Hardy and was planning to leave the jurisdiction. Neil then led police officers to a gravel lot two and one-half miles east of New Bern, diagonally across Highway 70 from the fairgrounds.

Ernest Hardy's remains were found in the surrounding wooded area, sixty-nine feet from the edge of the gravel lot. The land sloped so the body could not easily be seen from the lot. The body lay face up. It was substantially decomposed and partially skele-tonized where the flesh had been consumed by scavengers. The fly on the victim's pants was open and his right pocket turned inside out. The victim's lower jawbone rested some twenty-five yards away from the body. Three human teeth, the victim's blood-stained baseball cap, and a wooden club with a metal end and the trade name "Tire Billy" printed on it were found on the site. An autopsy performed by Dr. Darlene Thorn, forensic pathologist, revealed several significant skull injuries. Dr. Thorn noted multiple fractures inflicted by at least five major blows with a blunt instrument. There was a large hole in the left forehead area where a portion of the skull was missing. The cause of death was blunt trauma injury to the brain and skull.

Both defendant and Neil were arrested and charged, respectively, with murder in the first degree and accessory after the fact. Upon arrest defendant repeated the story about the mysteri-

ous black men in spite of Investigator's Arthur's indication that Neil had implicated him.

On 27 April Investigator Arthur responded to a message from the county jail that defendant wanted to talk to him. Defendant stated that he wanted to "get straight and tell the truth," then blamed Neil for the murder. Investigator Arthur later confronted Neil with defendant's accusations. Neil made another statement which included previously undisclosed information about his own role in the killing. Neil was then charged with murder and robbery. Before trial Neil pled guilty to murder in the second degree and robbery with a dangerous weapon.

At trial the state relied primarily on the eyewitness testimony of Neil, who testified pursuant to a plea agreement. According to Neil, on 5 April he and defendant drank and smoked marijuana throughout the day. They went to Jerry's Lounge at about 7:30 to continue drinking. Ernest Hardy came in and started flashing his money around in the bar. Later that evening defendant agreed to give Hardy a ride home, but when Hardy was out of earshot, defendant privately told Neil that he was going to "knock Ernest Hardy in the head."

After the three men had driven five or ten miles down Highway 70, defendant said he had to use the bathroom. He pulled off the road into a vacant lot across from the fairgrounds. Hardy got out and walked around to the back of the car while Neil remained inside. Defendant reached into the backseat along the floorboard where he kept a club, then walked to where Hardy was standing. Neil heard a loud thump. He looked back and saw Hardy fall to the ground. When he got out to investigate he saw defendant standing over the fallen Hardy, beating him in the head with the club.

Defendant bludgeoned Hardy several times. He then stopped and dropped the club, whereupon Neil picked it up. Defendant told Neil to hit Hardy so Neil clubbed him three times. They rolled Hardy over and defendant took his wallet, diamond ring, and gold necklace while Neil took his knife and belt. They then dragged Hardy into the woods and placed him on some rocks. Defendant observed that Hardy was still breathing and struck Hardy's face two or three times with a rock. At defendant's sug-

gestion Neil also hit Hardy with a rock. Defendant warned Neil that he would kill him if he told anyone about the incident.

On the way back to the bar, defendant instructed Neil to state, if questioned, that Hardy had gotten in a car at the Exxon station with two big black men. Defendant said he was going to get his paycheck and go to Texas so he could "get out of town before they caught up with what had happened."

The state also presented the testimony of jailer James Sauls. On 29 April Sauls had a conversation with defendant at the Craven County Jail which prompted him to contact Investigator Arthur. During a discussion concerning the effect of defendant's incarceration upon his family, Sauls encouraged defendant to rely on the Bible. Defendant responded that twice he got away from the Bible and each time ended up in jail. He stated "I was out smoking that dope and I knocked a man in the head and here I am again."

Defendant presented evidence tending to show that Eddie Neil, while incarcerated in Craven County Jail, threatened another inmate by stating "I done killed one [person] and it means nothing to me if I have to kill you." Defendant also testified on his own behalf and denied bludgeoning the victim. He stated that he had gotten an insurance check the first week of April from which he had $300 left over. Neil, on the other hand, was out of work and rarely had money for drinks. On the night in question defendant bought drinks for Neil and when Hardy came in they alternated buying rounds for the people in the bar. They left about 12:30 a.m. in order to share some marijuana and cocaine that Hardy had. Neil said he had to use the bathroom so they pulled off the road and everyone got out of the car. When defendant finished urinating and turned around towards the car, he saw Neil get the club out of the car and hit Hardy in the back of the head. When Hardy fell down Neil beat him several times, then ordered defendant to help drag the body. Defendant helped because he was afraid Neil would turn on him if he refused. Neil noticed that Hardy was still alive and said he needed to kill him because he had seen his face at the bar. Neil picked up a rock and hit Hardy repeatedly in the face and chest right over the heart. Again defendant did not intervene for fear that he would also be killed. Hardy was still breathing when they left. Neil made up the

story about the black men and told defendant to back him up or his life would be in danger.

Defendant also testified that he grew up in a family of ten children and completed the eleventh grade in school. He has held a variety of jobs in three states and at the time of the offense was employed as a carpenter at Hatteras Yachts. He has previously been convicted of armed robbery, tampering with a vehicle, abandonment of children, and two counts of driving while intoxicated. Once he caught his wife "running out" on him and shot a pistol three times into the roof of their home. He used to shoot cocaine but at the time of the offense was not shooting or using the drug heavily, although he was dealing it and taking a portion of the cocaine as profit. On the night in question he drank heavily and used both cocaine and marijuana.

The jury convicted defendant of murder in the first degree based upon theories of premeditation and deliberation and felony murder. Defendant was also convicted of robbery with a dangerous weapon. Pursuant to N.C.G.S. § 15A-2000(a)(1), a sentencing hearing was held to determine defendant's punishment for the murder conviction.

The state presented no evidence in the sentencing phase. Defendant put on several character witnesses whose testimony tended to show that he has an easygoing personality, has been a model inmate at Craven County Jail, and has been a loving brother and son. A psychological evaluation from Dorothea Dix Hospital indicated that he has an IQ of 84 and his intoxicated condition at the time of the crime "most probably restricted his ability to conform his actions within limits established by the law by determining a tendency for impulsive behavior with limited ability to control his emotions and conduct."

The jury found as aggravating circumstances that the murder was committed for the purpose of avoiding arrest, N.C.G.S. § 15A-2000(e)(4), and that the murder was committed while the defendant was engaged in the commission of a robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5). The jury found as statutory mitigating circumstances that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6), and that defendant aided in the apprehension of

another capital felon, N.C.G.S. § 15A-2000(f)(8). The jury also found the catchall circumstance of N.C.G.S. § 15A-2000(e)(9) and the nonstatutory circumstance that defendant was gainfully employed and a person of good reputation at his place of employment. Having determined that the mitigating circumstances were not insufficient to outweigh the aggravating circumstances, the jury recommended a sentence of life imprisonment. The trial judge then imposed a sentence of forty years' imprisonment for robbery with a dangerous weapon, to be served at the expiration of the life sentence. Defendant appealed the murder conviction pursuant to N.C.G.S. § 7A-27(a). His motion to bypass the Court of Appeals on the appeal of the robbery conviction was granted 1 February 1988.

[1] Defendant first contends that the indictment for murder in the first degree was fatally defective. The indictment, in compliance with the short form authorized by N.C.G.S. § 15-144, charged the following:

> The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder Ernest Raymond Hardy.

Except for the name of the victim, this indictment is identical to that approved by this Court in *State v. Avery*, 315 N.C. 1, 337 S.E. 2d 786 (1985). Defendant argues that the short form is deficient under N.C.G.S. § 15A-924(a)(5) and article I, section 23 of the North Carolina Constitution in that it (1) fails to allege premeditation and deliberation and (2) fails to allege the elements of felony murder. These contentions are identical to the arguments we rejected in *Avery*. Defendant has presented no compelling reason to reconsider *Avery* and we therefore decline to do so.

[2] Defendant next contends that the trial court erred in failing to require the state to elect either the theory of premeditation and deliberation or the theory of felony murder. Again this is an issue which we have repeatedly resolved contrary to defendant's position, most recently in *State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied*, --- U.S. ---, --- L.Ed. 2d --- (13 June 1988). We find no basis to reconsider our previous decisions and this assignment of error is overruled.

[3]   Defendant next contends that the trial court erred in deny-ing his motion for a change of venue based on pretrial publicity in Craven County. Defendant based his motion upon the following eight articles published in The [New Bern] Sun-Journal: *Reward offered in case of missing man*, Apr. 16, 1987; *Family concerned for missing man*, Apr. 22, 1987; *Missing Craven man's body found*, Apr. 25, 1987; *Second man charged in murder*, Apr. 28, 1987; *Lawyers appointed in murder case*, Apr. 30, 1987; *Grand jury in-dicts 2 for murder, robbery*, May 12, 1987; *Maysville man admits murder role*, Jul. 28, 1987; and *Murder trial opens*, Sept. 11, 1987.

A motion for change of venue is addressed to the sound dis-cretion of the trial judge and his decision will not be disturbed on appeal unless the defendant demonstrates an abuse of discretion. *State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976). The burden is on the moving party to show that due to pretrial publicity there is a reasonable likelihood that he will not receive a fair trial. *State v. Abbott*, 320 N.C. 475, 358 S.E. 2d 365 (1987). Fac-tual, noninflammatory accounts regarding the commission of a crime and the pretrial proceedings are ordinarily not sufficient grounds for granting the motion. *Id.; State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981). Moreover, where a defendant does not show that he exhausted his peremptory challenges or that jurors had prior knowledge of the case, he fails to carry the burden of establishing prejudice. *State v. Johnson*, 317 N.C. 343, 346 S.E. 2d 596 (1986); *State v. Dobbins*, 306 N.C. 342, 293 S.E. 2d 162 (1982).

Having reviewed the articles complained of, we find each to be factual and devoid of any prejudicial speculations or character-izations. Nor does the record disclose that defendant exhausted his peremptory challenges or that any juror had prior knowledge of the case. Under the circumstances the trial judge did not abuse his discretion in denying defendant's motion.

[4]   Defendant next contends that the trial court erred in refus-ing to require the state to reveal the name of witness James Sauls and to provide a copy of Sauls' written statement to defend-ant prior to trial.

Sauls, a civilian jailer at Craven County Jail, gave a state-ment to Investigator Arthur recounting a conversation with de-fendant during which defendant said, "I was out smoking that dope and I knocked a man in the head." Arthur reduced Sauls'

recollection of this conversation to writing. In the pretrial discovery phase, the state provided defendant with the substance of his own remarks to Sauls without identifying Sauls or providing a copy of the written statement. Defendant argues that he was entitled to this information. Our examination of the pertinent statutory provisions demonstrates that the state fully complied with discovery requirements.

First, we note that the state had no duty to divulge Sauls' name to defendant before trial. The legislature has expressly refused to adopt a requirement that the state furnish the accused with the names of its witnesses. *See* N.C.G.S. § 15A-903 official commentary (1983). We have long held that defendants are not entitled to such a list. *E.g., State v. Sledge,* 297 N.C. 227, 254 S.E. 2d 579 (1979); *State v. Tatum,* 291 N.C. 73, 229 S.E. 2d 562 (1976).

Nor was the state obliged to provide defendant with a copy of Sauls' complete statement to Investigator Arthur. N.C.G.S. § 15A-903(a)(2) requires the state to divulge "the substance of any oral statement relevant to the subject matter of the case made by the defendant, regardless of to whom the statement was made." The state complied with this subsection by disclosing that portion of Sauls' statement which recited defendant's own words from the jailhouse conversation. Defendant was not entitled to a description of the facts and circumstances surrounding these statements. *State v. Bruce,* 315 N.C. 273, 337 S.E. 2d 510 (1985).

Nor was he entitled to a pretrial copy of Sauls' written statement. N.C.G.S. § 15A-903(f)(1) provides that "no statement or report in the possession of the State that was made by a State witness or prospective State witness, other than the defendant, shall be the subject of subpoena, discovery, or inspection *until that witness has testified on direct examination* in the trial of the case." (Emphasis added.)

Similarly, under N.C.G.S. § 15A-904(a), the state is not required to furnish defendant *before trial* any statement made by a witness of the state to anyone acting on behalf of the state. If the statement in question is material and favorable to the defendant, the state is required to disclose it to the defense *at trial. State v. Jackson,* 309 N.C. 26, 305 S.E. 2d 703 (1983). Here the state made Sauls' written statement available to defendant at trial in accordance with these statutory provisions.

[5] In a companion argument, defendant contends that the trial court erred in denying his motion to withdraw juror Carter, who was personally acquainted with James Sauls. Because Sauls' name was not revealed during jury selection, Carter's acquaintance with him was not apparent until counsel observed the two greeting one another at the courthouse. Upon defendant's motion, the trial court conducted a voir dire examination of juror Carter during which the following colloquy occurred:

THE COURT: Mr. Carter, are you acquainted with Mr. Sauls who was testifying in this case?

JUROR CARTER: I am acquainted with him. You see, when he retired out of the service, he moved into our neighborhood, yes.

THE COURT: Would the fact that you know him and have known him over some period of time, in the event that he testifies in this case, make it more difficult for you to be fair and impartial?

MR. CARTER: No, sir.

Counsel for defendant continued the inquiry:

Q. Did you see him around here last week while you were here at all?

A. I think I saw him one time yes, one time last week.

Q. Do you recall speaking to him at that time?

A. Just, yes "hi, how you been doing?" Not no conversation whatsoever.

Q. And you are convinced the fact that you know him you can put all of that aside, is that what you are saying?

A. Yes, I mean.

After a jury has been impaneled, further challenge of a juror is a matter within the sound discretion of the trial judge. *State v. Kirkman*, 293 N.C. 447, 238 S.E. 2d 456 (1977). Here both the court and the defense attorney questioned juror Carter about his relationship with the state's witness. Carter stated unequivocally that the acquaintance would not affect his ability to remain fair and

impartial. Under the circumstances we find no abuse of discretion in the trial judge's denial of defendant's motion to withdraw juror Carter. *See State v. McLamb*, 313 N.C. 572, 330 S.E. 2d 476 (1985); *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562.

[6] Defendant next contends that the preliminary pattern jury instruction given was erroneous. The instruction in question, N.C.P.I.—Crim. 106.10, explains the bifurcated nature of first degree murder trials, noting that in the event of a conviction a separate sentencing proceeding with separate instructions will convene. In pertinent part the instruction reads: "However, prior to that time the only concern of the trial jury is to determine whether the defendant is guilty of the crime charged or of any lesser included offenses about which it is instructed." Defendant complains that this instruction failed to mention the alternative of a "not guilty" verdict, thereby creating the erroneous impression that conviction of the crime charged or conviction of a lesser included offense were the only options in the guilt phase of his trial.

We find this assignment of error to be meritless. Clearly, the purpose of the instruction is to limit the jury during the first phase of the trial to consideration of issues bearing upon the guilt or innocence of the accused, without concern as to sentencing issues. We perceive very little possibility of jury confusion. Moreover, at defendant's urging, the trial judge further instructed as follows: "I would charge you to remember . . . that there are three possible ways that this first phase of this trial may be resolved. That is, you may find the Defendant guilty as charged *or* you may find him guilty of some lesser included offense, or you may find him not guilty." Thus, in the unlikely event that confusion had resulted from the preliminary instruction, the trial judge remedied the situation with the curative instruction.

[7] Defendant next argues that the trial court erred in failing to declare a mistrial after Investigator Arthur testified that he had asked both defendant and Eddie Neil to take a polygraph test.

In *State v. Grier*, 307 N.C. 628, 300 S.E. 2d 351 (1983), this Court disapproved the use of polygraph test results at trial even when the parties stipulate to their admissibility. The trial judge, wary of running afoul of that decision, cautioned the parties before trial to avoid references to polygraph tests. Nonetheless,

on direct examination of Investigator Arthur the following transpired:

Q. Did you have any further conversation with [defendant] or Neil that night?

A. Yes, sir. I asked both of them if they would agree to take a—polygraph test.

MR. ASHTON: Objection.

COURT: Sustained.

Whether a motion for mistrial should be granted is a matter addressed to the sound discretion of the trial judge. A mistrial is appropriate only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict. *State v. Calloway*, 305 N.C. 747, 291 S.E. 2d 622 (1982). Under the facts of this case we find no abuse of the trial judge's discretion in denying defendant's motion.

The witness' statement that "I asked both of them if they would agree to take a—polygraph test" is neutral on its face. The testimony does not reveal the responses of defendant or Neil to the request or whether the test was ever given at all. Furthermore, defendant's bald assertion that "[t]he statement clearly could have left jurors with the idea that Neil must have taken the test and passed and [defendant] must have taken the test and failed, or refused the test, and that is why Neil was turning State's evidence and [defendant] was on trial for his life" is unsupported. The record reveals that the able trial judge took appropriate action to prevent any such inference by allowing defendant's cross-examination of Investigator Arthur to address that concern:

Q. Now, prior to your meeting with Eddie Neil that morning, had you ever asked [defendant] to take a polygraph?

A. Yes, sir.

Q. Isn't it true that he indicated his willingness to do that?

A. Yes, sir.

Q. But you never set up that test, did you?

A. No, sir.

MR. ASHTON: Your Honor, would it be appropriate to ask [for] a cautionary instruction about that?

THE COURT: All right. Members of the jury, at this point the Court would instruct you that the Supreme Court of North Carolina has ruled that polygraph evidence is not reliable enough to be offered in courts of law in the State of North Carolina, even by the agreement of counsel, so I would caution you not to attach any significance to that. Is that sufficient?

MR. ASHTON: Yes, sir, thank you, Your Honor.

Because any possible prejudice was removed by the cross-examination and cautionary instruction, defendant has not shown that the impropriety in the present case was so egregious as to affect the jury's ability to render an impartial verdict.

Defendant alternatively argues that Arthur's improper testimony "opened the door" to lie detector evidence and the trial court therefore erred in prohibiting the defense from introducing evidence that defendant willingly took and passed a voice stress analysis test. The record demonstrates that the trial judge did in fact indicate that he would permit defendant to elicit such evidence. However, defendant apparently chose to question Arthur about the polygraph test only and made no attempt to elicit evidence about the voice stress analysis test. He may not now be heard to complain about his own trial strategy. These assignments of error are overruled.

[8] Defendant next assigns error to the admission over objection of a color photograph of the victim's remains. The photograph in question depicts the victim's decomposed body as it appeared when discovered on 24 April, some two and one-half weeks after the murder. While the victim's lower body appears intact, the upper body has apparently been ravaged by animals to such an extent that the skull, neck, and arms have been substantially stripped of flesh, the torso has been partially consumed, and the right hand has been completely gnawed off. The lower jawbone is missing from the skull. While we agree that the photo is grisly and unpleasant, we find no error in its admission into evidence.

As a general rule, the fact that a photograph is gory and may tend to arouse prejudice does not render it inadmissible, so long

as it is otherwise relevant and material. *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (1969), *overruled on other grounds, State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975). Thus, in a homicide case, photographs showing the condition of the body and its location when found are competent in spite of their portrayal of a gruesome spectacle. *State v. Elkerson*, 304 N.C. 658, 285 S.E. 2d 784 (1982). This holds true even where the photographs depict remains in an advanced state of decomposition, *see State v. Marlow*, 310 N.C. 507, 313 S.E. 2d 532 (1984), and where the cause of death is· uncontroverted, *see Elkerson*.

However, the admission of an excessive number of photographs, depicting substantially the same scene, may be prejudicial error where the additional photographs add nothing of probative value but tend solely to inflame the jury. *See State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979) (of five photographs depicting the victim's body in an advanced state of decomposition and partially dismembered by animals, only one had probative value; others were deemed repetitive and immaterial); *State v. Mercer*, 275 N.C. 108, 165 S.E. 2d 328 (three photographs of victim at funeral home with projecting probes indicating the points of entry and exit of the bullet were inflammatory and had no probative value). Such evidence should be excluded when its prejudicial effect outweighs its probative force. *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889 (1963).

Here Investigator Michael Rice identified the photograph in question as a fair and accurate representation of the victim's body as it appeared at the crime scene. The photograph was therefore admissible, in spite of its gruesomeness, to illustrate the location and position of the body when found. It was also probative in that it tended to corroborate certain details of the testimony of defendant and Neil. For example, the photograph shows that the victim's pants are unzipped, one pocket turned out, and his belt missing, facts consistent with accounts of the attack and subsequent robbery. Because the state introduced only one photograph of the victim's body,[1] no issue of inflammatory repetition arises. This assignment of error is overruled.

---

1. The state also introduced a photograph of the victim's jawbone lying in the grass. Defendant did not object to its admission into evidence.

[9] Defendant next contends that the trial court erred in allowing the prosecutor to cross-examine defendant about a fight in which he was involved at Dorothea Dix Hospital during his competency evaluation. The state insists that the questioning was permissible under the North Carolina Rules of Evidence as a means of impeaching defendant's credibility. We disagree.

Rule 608(b) governs the impeachment of a witness' credibility through extrinsic evidence of specific instances of his conduct. The rule provides as follows:

> (b) *Specific instances of conduct.*—Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

As we noted in *State v. Morgan*, 315 N.C. 626, 634, 340 S.E. 2d 84, 89 (1986):

> Rule 608(b) represents a drastic departure from the former traditional North Carolina practice which allowed a defendant to be cross-examined for impeachment purposes regarding *any* prior act of misconduct not resulting in conviction so long as the prosecutor had a good-faith basis for the questions.

Now, under the rule, "the only character trait relevant to the issue of credibility is veracity or the lack of it. The focus, then, is upon whether the conduct sought to be inquired into is of the type which is indicative of the actor's character for truthfulness or untruthfulness." *Id.* at 634-35, 340 S.E. 2d at 90.

The state's assertion that questions about the fight were addressed to the issue of defendant's credibility is disingenuous at best. Clearly "extrinsic instances of assaultive behavior, standing alone, are not in any way probative of the witness' character for truthfulness or untruthfulness." *Id.* at 635, 340 S.E. 2d at 90.

We reject the credibility theory advanced by the state and hold that it was error to admit the extrinsic conduct evidence. We note that the state made no attempt to present an alternative argument for admissibility under Rule 404(b). We therefore express no opinion as to whether the evidence was elicited solely to prove a propensity for violence or aggressive behavior, in violation of Rule 404(a), or was elicited for a legitimate purpose under the exceptions of Rule 404(b).

Although we have determined that the cross-examination was error, we find this error to be a harmless one under the facts of this case. Defendant's testimony revealed that the brief altercation at Dix was not a fist fight. He had merely pushed another patient down as a means of defending himself when the man attacked him. Defendant did not remain hostile and was not disciplined or "locked down" by the hospital staff. This testimony, portraying defendant as the victim rather than the aggressor in the incident, tended to cast him in a favorable light. Under the circumstances there was no reasonable possibility that a different result would have been reached at trial absent the error in question. N.C.G.S. § 15A-1443(a) (1983).

[10] Defendant next assigns error to the trial court's denial of his motion to dismiss the charge of premeditated and deliberate murder. We note at the outset that the denial of defendant's motion to dismiss at the close of the state's evidence is not properly at issue on this appeal. Defendant chose to offer evidence after his motion was denied and thereby waived appellate review of the trial judge's decision. *State v. Griffin*, 319 N.C. 429, 355 S.E. 2d 474 (1987); N.C.G.S. § 15-173 (1983); N.C.R. App. P. 10(b)(3). We need only address defendant's motion to dismiss at the close of all the evidence.

In considering a motion to dismiss in a criminal matter, the trial court must determine whether there is substantial evidence of each element of the offense charged and substantial evidence that the defendant is the perpetrator. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984). The evidence must be examined in the light most favorable to the state, and the state is entitled to every reasonable inference to be drawn therefrom. *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980). Any contradictions or discrepancies in the evidence are for the jury to resolve and do

not warrant dismissal. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980).

Murder in the first degree is the intentional and unlawful killing of a human being with malice, premeditation, and deliberation. *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979); N.C.G.S. § 14-17 (1986). Premeditation means that the defendant formed the specific intent to kill for some length of time, however short, before the actual killing. *State v. Misenheimer*, 304 N.C. 108, 282 S.E. 2d 791 (1981). Deliberation means that the intent to kill was executed in a cool state of blood, without legal provocation, and in furtherance of a fixed design for revenge or to accomplish some unlawful purpose. *State v. Britt*, 285 N.C. 256, 204 S.E. 2d 817 (1974). No particular length of time is required for the mental processes of premeditation and deliberation; it is sufficient that the processes occur prior to, and not simultaneously with, the killing. *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541 (1970).

Premeditation and deliberation ordinarily must be proved by circumstantial rather than direct evidence. *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L.Ed. 2d 733 (1986). Some of the circumstances which may support an inference of premeditation and deliberation are: a lack of provocation on the part of the victim; the conduct and statements of the defendant before and after the killing; threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the victim; ill-will or previous difficulty between the parties; the dealing of lethal blows after the victim has been felled and rendered helpless; the brutality of the killing; and the nature and number of the victim's wounds. *Id.*

Applying these familiar principles to the case at hand, we find ample evidence of premeditation and deliberation in the circumstances surrounding the death of Ernest Hardy. According to the testimony of Eddie Neil, prior to the victim's entry of defendant's vehicle defendant stated that he planned to "knock Ernest Hardy in the head." Defendant soon thereafter concocted a pretext which allowed him to stop the car in a deserted area and lure the unsuspecting victim out of the car. While the victim was urinating with his back turned, defendant grabbed a club from the car and crept up behind him. He knocked the victim down with a single blow to the head, then struck several more blows as

the victim lay helpless on the ground. Later, when he noticed that the victim was still breathing, defendant struck the victim's head and face several times with a large rock. Viewed in the light most favorable to the state, this evidence shows a statement of violent intent by defendant well in advance of the murderous deeds, a distinct lack of provocation on the part of the victim, and a brutal killing involving multiple skull injuries, many of which were inflicted after the victim had already been felled and incapacitated. Accordingly, we hold that there was sufficient evidence of premeditation and deliberation to take the case to the jury and to support the conviction on that theory.

[11] Defendant next contends that the trial court erred in denying his request for a special instruction on motive. Defendant does not dispute the propriety of the charge with respect to his *own* motive; rather he argues that the jury should have also been instructed that it could give equal consideration to *Eddie Neil's* motive. Defendant cites no authority for his position.

Here the trial judge gave defendant wide latitude to develop his theory that Neil was motivated by economic deprivation to commit the murder. Furthermore, the judge admonished the jury to examine Neil's testimony "with the greatest care and caution" in light of evidence that he was an accomplice and in light of his plea agreement with the state. The jury was well apprised of Neil's interest in the outcome of the case. Moreover, because the trial judge charged the jury upon the alternative theory that defendant and Neil were acting together in concert in committing the murder, an instruction as to Neil's motive to kill the victim would have been harmful to defendant rather than helpful.

[12] Defendant next contends that the trial court erred in refusing his request for an instruction substantially in compliance with the pattern jury instruction on aiding and abetting. This assignment of error is frivolous. Defendant was not charged with aiding and abetting, nor does any of the evidence support such a theory. The state's evidence tended to show that defendant was a principal in the murder, while defendant's evidence tended to show that he was at most an accessory after the fact. Therefore, defendant was not entitled to an instruction on the principles of aiding and abetting. *See State v. Cameron,* 284 N.C. 165, 200 S.E. 2d 186 (1973), *cert. denied,* 418 U.S. 905, 41 L.Ed. 2d 1153 (1974).

[13] Finally, defendant challenges the forty-year sentence imposed under the Fair Sentencing Act for robbery with a dangerous weapon. He argues that the trial judge abused his discretion in determining that the single aggravating factor of prior convictions, N.C.G.S. § 15A-1340.4(a)(1)o, outweighed the two mitigating factors of physical condition, N.C.G.S. § 15A-1340.4(a)(2)d, and aiding in the apprehension of another felon, N.C.G.S. § 15A-1340.4(a)(2)h.

As we observed in *State v. Melton*, 307 N.C. 370, 380, 298 S.E. 2d 673, 680 (1983):

> The discretionary task of weighing mitigating and aggravating factors is not a simple matter of mathematics. For example, three factors of one kind do not automatically and of necessity outweigh one factor of another kind. The number of factors found is only one consideration in determining which factors outweigh others. The court may very properly emphasize one factor more than another in a particular case. The balance struck by the trial judge will not be disturbed if there is support in the record for his determination.

We discern neither defiance of logic nor abuse of discretion in according the prior-conviction factor greater weight in light of the evidence supporting the finding. The judge acted well within the bounds of reason in determining that this aggravating factor outweighed the mitigating factors.

In defendant's conviction and sentences we find

No error.