STATE OF NORTH CAROLINA v. WILLIAM MACRAE WILLIS

No. 913SC1286

(Filed 2 March 1993)

1. **Evidence and Witnesses § 1756 (NCI4th)— murder—use of mannequin's head to illustrate testimony**

   The trial court did not err in a murder prosecution by allowing the expert witness who had performed the autopsy to place a dowel through a mannequin's head to illustrate the path of the bullet where the expert did not testify that the mannequin head was identical to the head of the victim and admitted that the mannequin was not a cast of the victim's head. The use of the model was limited to illustrating the testimony of the witness and the jury was admonished by the court to consider the model in that respect only. Any discrepancies between the model and the victim go to the weight given the illustration by the jury, not its admissibility.

   **Am Jur 2d, Expert and Opinion Evidence § 39.**

   **Propriety, in trial of criminal case, of use of skeleton or model of human body or part. 83 ALR2d 1097.**

2. **Constitutional Law § 264 (NCI4th)— right to counsel— incriminating statements made after request for counsel—no custodial interrogation—no adversary proceedings—no attachment of right**

   There was no violation of a murder defendant's Fifth and Sixth Amendment rights to counsel in the admission of incriminating statements where defendant maintains that he asked the district attorney whether he needed a lawyer prior to questioning and was told that he did not. Defendant was not in custody and therefore may not claim a Fifth Amendment right to counsel, and did not have a Sixth Amendment right to counsel because adversary proceedings had not begun when he made the inquiry regarding counsel.

   **Am Jur 2d, Evidence §§ 555, 556, 613, 614.**

   **What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

STATE v. WILLIS

[109 N.C. App. 184 (1993)]

3. **Evidence and Witnesses § 1218 (NCI4th) — murder — defendant's statements — voluntary**

The trial court did not err in a murder prosecution by failing to sustain defendant's objections to his written and oral statements, along with corresponding testimony by the officers to whom the statements were given, on the grounds that the State failed to prove that the statements were voluntarily and understandingly made. Contrary to defendant's contentions, the record provides ample evidence that defendant was informed prior to each interview that he was not in custody or under arrest and that the interviews would terminate upon his request; the uniformed officer escorting defendant was his brother, who drove him to and from the interviews, and there is nothing in the record to suggest he was involved in the investigation in any official capacity; the amount of medication defendant may or may not have been taking is in dispute, but nothing in his conduct during any of the interviews suggested that he did not comprehend what was occurring or that he did not understand the questions he was being asked; defendant's trial testimony that the district attorney misrepresented the location of the entry wound to him in an attempt to coerce his confessions was not offered during the voir dire hearing on admissibility and so cannot be the basis for assigning error to that ruling; standing alone, that misrepresentation does not show that an incriminating statement was involuntarily made; and defendant may not challenge the ruling based on his failure to read the statements prior to signing where undisputed testimony on voir dire confirmed that the officer transcribing the statements read each of them to defendant prior to his signing them.

**Am Jur 2d, Evidence §§ 555, 612.**

**Comment Note: Constitutional aspects of procedure for determining voluntariness of pretrial confession. 1 ALR3d 1251.**

4. **Evidence and Witnesses § 2210 (NCI4th) — blood spatter interpretation — qualification of witness as expert — no abuse of discretion**

The trial court did not abuse its discretion in a murder prosecution by permitting an S.B.I. agent to be qualified as an expert in blood spatter interpretation and then by allowing him to testify in that capacity. Although defendant contends

STATE v. WILLIS

[109 N.C. App. 184 (1993)]

that the witness failed to provide evidence that the instructors at courses he had attended were experts, that the State did not show that blood spatter interpretation is commonly accepted in the scientific community, and that the court failed to make specific findings as to why the agent was considered an expert in this field, the designation of a witness as an expert and the admission of expert testimony are within the sound discretion of the trial court, the trial court is under no obligation to make findings of fact regarding its decision to designate a witness as an expert, and the expert is not required to have specific credentials.

Am Jur 2d, Expert and Opinion Evidence §§ 60, 62.

5. **Evidence and Witnesses § 1785 (NCI4th)— polygraph test— questions and answers used to impeach defendant—test not mentioned—agent's opinion as to truthfulness—not admissible**

The trial court erred in a murder prosecution by admitting a polygraph examiner's testimony concerning his interview with defendant where the agent described the interview, including three of his questions and defendant's answers, but did not mention the polygraph test itself. The examiner's sole basis for testifying that defendant lied in answering his questions was his interpretation of the polygraph test results, evidence which the Supreme Court has held to be inherently unreliable. The State was able to impeach defendant's testimony by showing his character for untruthfulness. Allowing this unreliable opinion testimony may have caused the jury to disbelieve defendant's testimony.

Am Jur 2d, Evidence § 296.

Propriety and prejudicial effect of informing jury that accused has taken polygraph test, where results of test would be inadmissible in evidence. 88 ALR3d 227.

Appeal by defendant from judgment entered 24 June 1991 by Judge Herbert O. Phillips, III, in Carteret County Superior Court. Heard in the Court of Appeals 9 February 1993.

Defendant was convicted of one count of second degree murder and was sentenced to fifteen years active imprisonment. The State's evidence tends to show the following facts and circumstances: The police were dispatched to defendant's home on 20 January 1991

where they found defendant's wife dead from a gunshot wound to the head. Defendant told officers that his wife had called him from the bedroom, and when he entered he saw her sitting on the bed holding a gun to her head. Defendant stated that she said, "Mac, I'm sorry," and pulled the trigger. Defendant gave rescue squad members a similar account en route to the hospital.

Police again interviewed defendant on 24 January 1991, where he gave another account of the events leading up to his wife's death. At this meeting, defendant was neatly dressed and appeared well. He was informed that he was not in custody or under arrest and that he was free to leave. During the interview, defendant told officers that his wife called out to him from the bedroom, and that when he entered the room she was kneeling or crouching between the bed and a couch. She said, "I'm sorry," and fired the gun. Defendant stated he had run toward her when he saw the gun and was just a few feet from her when it fired. He said she was coughing up blood and choking, and he laid her on the bed and called the rescue squad.

On 28 January 1991, defendant voluntarily submitted to a polygraph test. Defendant arrived with his brother, a Marine Fisheries Enforcement Officer. Again defendant was reminded that he was not in custody and that he could leave at any time. Prior to the test, investigators asked whether defendant was on any medication. He indicated that the last medication he had taken was 10mg of Valium on 26 January 1991 and an alka-seltzer that morning. Defendant took the polygraph test, answering "No" when asked whether he had shot his wife, whether he had fired the gun, and whether he was holding the gun when it went off. Afterwards, the agent administering the test told defendant that he felt defendant was not giving truthful answers to those three questions. The agent told defendant that he believed either that defendant was a cold-blooded killer, that he had intended to scare his wife and shot her accidentally, or that his wife put the gun to her head to scare him and he pulled the trigger thinking the gun was empty. Defendant stated that there was a little truth in all three scenarios.

After the test, defendant gave another account of the events leading up to his wife's death to investigators, admitting for the first time that there had been a struggle for the gun. He stated that he did not have his hand on the gun when it went off, and

that he thought it had fired accidentally during the struggle. He had not expected it to fire because it was his practice to keep the first chamber empty. He then altered his story, stating that he knew he had his hand on the gun just as he knew the sun had come up that morning. An officer read defendant's statement to him and it was transcribed and signed by defendant. He was neither in custody nor under arrest when the statement was signed.

Defendant was then asked if he would reenact the shooting at his home. He agreed and signed a consent form granting officers admission to his house. Prior to beginning the reenactment, defendant was again told that he was not under arrest and that the officers would leave upon his request. Defendant's brother was also present at this time. Defendant instructed the officer playing the role of his wife to kneel near the couch. Defendant moved the officer into several different positions and placed the gun in various positions as well. After the demonstration, one of the officers said to defendant, "You can't make it work the way you say it was." Defendant answered, "I know it."

Defendant's final interview was held on 29 January 1991 at his residence. Again, defendant's brother was present. Officers repeated that defendant was not in custody and that they would leave upon request. Defendant signed a form consenting to the officers' presence in his home and then made another statement which was read to him and transcribed by an officer. Defendant signed the statement, but testified at trial that he had not read it. In the statement, he said he and his wife had argued about one of them leaving the home. They struggled over the gun in the bedroom. Defendant stated he had the gun in his possession and meant to scare his wife with it. He had not known it was loaded and he had shot her by accident.

At trial, defendant testified in his own defense. Defendant was convicted of second degree murder and received the presumptive sentence of fifteen years in prison. Defendant appeals.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Marilyn R. Mudge, for the State.*

*Wheatly, Wheatly, Nobles & Weeks, P.A., by Stephen M. Valentine, for defendant-appellant.*

STATE v. WILLIS

[109 N.C. App. 184 (1993)]

WELLS, Judge.

[1] Defendant offers five assignments of error on appeal. By his first assignment of error, defendant contends the court erred in overruling his objection to the use of a mannequin's head to illustrate the testimony of expert witness Dr. Charles L. Garrett. Dr. Garrett performed the autopsy on the victim. At trial, he was permitted to place a dowel through the mannequin's head to illustrate the path of the bullet. Dr. Garrett testified that the exit and entrance wounds were fairly and accurately depicted by the model. Dr. Garrett did not, however, testify that the mannequin head was identical to the head of the decedent, and he admitted that the mannequin was not a cast of decedent's head. Defendant argues the failure of the State to use a model identical to the decedent's head constitutes prejudicial error. We disagree.

The general rule concerning the use of a model in a criminal case is that any object which is relevant is ordinarily admissible into evidence. State v. Johnson, 280 N.C. 281, 185 S.E.2d 698 (1972); Brandis, North Carolina Evidence, § 34 (3d Ed. 1988). The record indicates that the use of the model in this case was limited to that of illustrating the testimony of the witness, and the jury was admonished by the court to consider the model in that respect only. Any discrepancies between the model and the victim go to the weight given the illustration by the jury, not its admissibility. The admission of the model was proper, and we therefore overrule this assignment of error.

[2] Defendant argues in his second assignment of error that the court erred in admitting incriminating statements made by defendant after he requested counsel. At trial, defendant testified that prior to the interview held on 28 January 1991, he asked the district attorney if he needed a lawyer. Defendant maintains he was told he did not. Defendant contends that at that moment the continued questioning was in violation of his Fifth and Sixth Amendment rights under the Constitution. We disagree.

The Fifth Amendment right to counsel attaches during custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 16 L.Ed.2d 694 (1966). The record discloses that defendant was not in custody during the interviews by police, or when the request for counsel was made. Defendant may not, therefore, claim a Fifth Amendment right to counsel nor did defendant have a Sixth Amendment right to counsel at the time in question. The Sixth Amendment right

attaches when the State has committed itself to prosecute, whether by formal charge, indictment, preliminary hearing, or arraignment. *State v. Franklin*, 308 N.C. 682, 304 S.E.2d 579 (1983). Because defendant was not in custody and no adversary proceedings against him had begun when he made the inquiry regarding counsel, the right had not attached and no violation had occurred. This assignment of error is overruled.

[3] By his third assignment of error, defendant contends the court erred by failing to sustain his objections to the admission of his written and oral statements, along with corresponding testimony by the officers to whom the statements were given. Defendant maintains that the State failed to prove the statements were voluntarily and understandingly made. This argument is without merit.

In determining whether a statement was voluntarily and understandingly made, the court must look at the totality of the circumstances. *State v. Pruitt*, 286 N.C. 442, 212 S.E.2d 92 (1975). Defendant contends that the following circumstances at the time the statements were made indicate that they were not voluntarily given: (1) that he was in custody; (2) that he was driven to the interviews by a law enforcement officer; (3) that he was under the influence of prescription drugs; (4) that he was misled by false information given by the district attorney; (5) that he was never given his Miranda warnings; and (6) that he did not read the statements before signing them.

The trial court found that because defendant was not in custody, the State was under no obligation to administer Miranda warnings. We agree. The record provides ample evidence that defendant was informed prior to each interview that he was not in custody or under arrest and that the interviews would terminate upon his request. Defendant's contention that his presence at the interviews was not voluntary because he was escorted by a uniformed officer is without merit. The officer in question was defendant's brother who drove him to and from the interviews. There is nothing to suggest he was involved in the investigation of the case in any official capacity, but rather he was only doing a service for a family member.

The amount of medication defendant may or may not have been taking at the time of the interviews is in some dispute. However, when asked prior to the 28 January 1991 interview, defendant stated he had taken nothing that day but an alka-seltzer. Nothing

STATE v. WILLIS

[109 N.C. App. 184 (1993)]

in defendant's conduct during any of the interviews suggested that he did not comprehend what was occurring or that he did not understand the questions he was being asked. There was no error by the court in determining that this was insufficient to warrant finding the statements to be involuntarily made.

At trial, defendant testified that the district attorney misrepresented the location of the entry wound to him in an attempt to coerce his confessions by showing that suicide was impossible. This testimony was not offered during the *voir dire* hearing on the admissibility of defendant's statements to police and so cannot be the basis for assigning error to that ruling. Even if the court had heard this testimony,. the misrepresentation of evidence is but one circumstance which, standing alone, does not show an incriminating statement was involuntarily made. *State v. Jackson*, 308 N.C. 549, 304 S.E.2d 134 (1983).

Finally, defendant may not challenge the ruling based on his failure to read the statements prior to signing them. Undisputed testimony on *voir dire* confirmed that the officer transcribing the statements read each of them to defendant prior to his signing them. On both occasions defendant assented to the statements as written. This is all that is necessary for the statements to be deemed admissible. *State v. Walker*, 269 N.C. 135, 152 S.E.2d 133 (1967). Our examination of the record as it relates to defendant's arguments reveals nothing which would support a finding that defendant's incriminating statements were not made voluntarily.

[4] By his fourth assignment of error, defendant contends that the court erred in permitting an S.B.I. agent to be qualified as an expert in blood spatter interpretation and then in allowing him to testify in that capacity. Defendant argues that while the agent testified that he attended law enforcement schools wherein blood spatter interpretation was taught, he failed to provide evidence that the instructors of these courses were experts nor did the State show that blood spatter interpretation is commonly accepted in the scientific community. Defendant also asserts the court failed to make specific findings as to why the agent was considered an expert in this field or why he was better qualified than members of the jury to arrive at the conclusions to which he testified. Defendant believed the witness was deemed an expert because he had been accepted as such in other trials.

The designation of a witness as an expert and the admission of expert testimony are within the sound discretion of the trial court and will not be upset absent a showing of abuse of discretion. *State v. Parks*, 96 N.C. App. 589, 386 S.E.2d 748 (1989). The trial court is under no obligation to make findings of fact regarding its decision to designate a witness as an expert. *State v. Wise*, 326 N.C. 421, 390 S.E.2d 142, *cert. denied*, 111 S.Ct. 146, 112 L.Ed.2d 113 (1990). The expert is not required to have specific credentials, *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984), and it is sufficient if the scientific technique supporting his testimony is reliable. *State v. Huang*, 99 N.C. App. 658, 394 S.E.2d 279, *cert. denied*, 327 N.C. 639, 399 S.E.2d 127 (1990). Further, there is nothing to indicate the trial court considered the witness's prior experience as an expert in qualifying him as such here. Our review of the record shows no abuse of discretion by the court in admitting this expert or his testimony. Accordingly, this assignment of error is overruled.

[5] By his final assignment of error, defendant contends the court erred in admitting the polygraph examiner's testimony, concerning his interview with defendant. The agent described the interview to the jury, including the three questions he had asked and defendant's answers to those questions. The polygraph test itself was never mentioned during testimony before the jury. Defendant contends the testimony constituted inadmissible polygraph evidence as defined under *State v. Grier*, 307 N.C. 628, 300 S.E.2d 351 (1983). We agree.

The North Carolina Supreme Court in *Grier*, ruled that because polygraph results are inherently unreliable, such evidence is inadmissible in any criminal or civil trial. Although not every reference to a polygraph test will necessarily result in prejudicial error, the admission of the test's results may be the basis of reversal on appeal. *See State v. Harris*, 323 N.C. 112, 371 S.E.2d 689 (1988). *See also State v. Singletary*, 75 N.C. App. 504, 331 S.E.2d 166 (1985).

In this case, the examiner's sole basis for his testimony was his interpretation of the polygraph test results, evidence which the Supreme Court has held to be inherently unreliable. The examiner's opinion regarding the truth or falsity of defendant's answers cannot be separated from the test results themselves. Our Court in *Singletary* noted the sensitive interrelationship between the

STATE v. WILLIS

[109 N.C. App. 184 (1993)]

reliability of the examiner in interpreting the polygraph results and the reliability of the test itself. The *Singletary* court further interpreted the *Grier* decision as follows:

> In our view when our Supreme Court held that "polygraph evidence" is no longer admissible, they meant that <u>all</u> evidence concerning whether or not, in the operator's opinion, the defendant was being deceptive, is to be excluded. Our conclusion is supported by the Supreme Court's stated . . . concern about the reliability of the machine itself and the reliability of the examiner in interpreting these results.

*Singletary, supra.* (Emphasis added.) It matters not whether the parties have made reference to the polygraph test itself at trial. The fact remains that the State was presenting inherently unreliable polygraph evidence through the witness examiner's opinion testimony. In permitting the examiner to testify that in his opinion, defendant lied in answering his three questions, the State was able to impeach defendant's testimony by showing his character for untruthfulness. At trial, defendant testified in his own behalf that his wife shot herself and he was unable to reach her in time to stop her. Allowing the unreliable opinion testimony of the polygraph examiner may have caused the jury to disbelieve defendant's testimony, and we cannot say that absent the examiner's testimony a different result would not have been reached.

In light of *Grier* and *Singletary*, it is clear that defendant was convicted in this case, at least in part, on evidence our Supreme Court has held to be inherently unreliable. We therefore order a new trial.

New trial.

Judges ORR and MARTIN concur.