STATE OF NORTH CAROLINA v. ANTHONY TERRELL GODLEY

No. COA99-1005

(Filed 19 September 2000)

**1. Jury— selection—questions restricted**

   The trial court did not abuse its discretion during jury selection in a prosecution for first-degree murder and assault by restricting certain lines of questioning while allowing defendant the opportunity to gain information about the prospective jurors' interests and prejudices or by not allowing defendant to ask individual jurors questions about relationships with other prospective jurors but permitting a question sufficient to determine whether the prospective jurors would be affected by the relationships.

**2. Evidence— exhibition of gun—gun not introduced—no relationship established with gun used in crime**

   The State's exhibition of a gun and use of the gun to illustrate defendant's testimony in a prosecution for murder and assault

was erroneous but not prejudicial where the evidence did not establish any relationship between the gun used in the exhibition and defendant's gun and the gun was never introduced into evidence, but the exhibition did not establish that defendant knew the procedure for firing the gun used in the shootings.

**3. Criminal Law— reasonable doubt—instructions**

The trial court did not err in a prosecution for murder and assault by giving an alternate definition of reasonable doubt instead of the Pattern Jury Instruction requested by defendant.

**4. Sentencing— mitigating factors—voluntary acknowledgment of wrongdoing—responsibility for criminal conduct**

The trial court did not err when sentencing defendant for assault by failing to find as mitigating factors that defendant voluntarily acknowledged wrongdoing and accepted responsibility for his criminal conduct. N.C.G.S. § 15A-1340.16(e)(11); N.C.G.S. § 15A-1340.16(e)(15).

**5. Sentencing— aggravating factor—great monetary loss— insufficient evidence**

The trial court erred when sentencing defendant for assault by finding as an aggravating factor that the offense involved damage causing great monetary loss where there was no evidence that the assault resulted in damage to the victim's property causing a monetary loss. N.C.G.S. § 15A-1340.16(d)(14).

Judge EDMUNDS concurring in the result.

Appeal by defendant from judgments dated 20 August 1998 by Judge W. Russell Duke, Jr. in Beaufort County Superior Court. Heard in the Court of Appeals 15 August 2000.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Constance E. Widenhouse, for defendant-appellant.*

GREENE, Judge.

Anthony Terrell Godley (Defendant) appeals judgments dated 20 August 1998 finding him guilty of first-degree murder and assault with a deadly weapon inflicting serious injury (assault). Defendant was

sentenced to life imprisonment without parole for the first-degree murder conviction and a minimum term of 36 months and a maximum term of 53 months for the assault conviction.

## Voir Dire

During *voir dire*, Defendant questioned a prospective juror regarding the types of hobbies, television programs, and books she enjoyed. The State objected to these questions, and the trial court sustained the objections. Defendant, however, was permitted to ask the prospective juror whether she "read literature involving crime, law enforcement officer[s], that sort of thing," whether she read books written by John Gresham, and whether she had "any particular interest in law enforcement or crime in general." Defendant subsequently stated, outside the presence of the prospective jurors, his continuing exception to the trial court's ruling that he not be permitted to ask questions regarding the prospective jurors' "interests in reading, hobbies, . . . movies, and criminal trials." The trial court sustained the State's objection to these questions, stating the proposed questions resulted in Defendant "visiting with the jury or establishing a rapport with the jury regarding television programs and books [and] other ideas, fashions."

Defendant also asked a prospective juror whether she was "opposed to citizens owning and possessing firearms" and whether she had "any prejudicial feelings about the use or possession of firearms." The State objected to these questions, and the trial court sustained the objections. Defendant, however, was permitted to ask the panel of prospective jurors whether any of them were "members of any anti-gun organizations." Additionally, Defendant asked a prospective juror whether she had "any particular feelings [or] prejudices against the use of alcohol." The State objected to this question, and the trial court sustained the objection and instructed Defendant to address his questions to the entire panel of prospective jurors. Defendant then asked the panel of prospective jurors whether any of them felt "that drinking or using alcohol [was] a sin or an evil thing to do." The trial court sustained the State's objection to this question. Defendant then was permitted to ask the prospective panel whether any felt "that their decision about how they received the evidence and how they . . . might interpret the testimony . . . would be affected . . . if there were evidence that . . . [D]efendant had consumed some type of alcoholic beverage."

Finally, Defendant discovered during *voir dire* that two of the prospective jurors had a landlord/tenant relationship, two of the

prospective jurors had a prior teacher/student relationship, and two of the prospective jurors were brother and sister. Defendant asked the panel of jurors the following question:

> Those of you that know individuals, other individuals on the jury, do any of you know of any reason why your contact or association with that other party would have an influence upon you or affect you in any way in sitting on the jury and being fair and impartial throughout this trial?

None of the jurors responded in the affirmative to this question. Defendant, however, also sought to question individual jurors regarding whether their relationships with other jurors would affect their deliberations. The trial court sustained the State's objection to these questions.

### Trial

The State presented evidence at trial that on the evening of 21 February 1997, James Earl Cox, Jr. (Cox) was sitting on his bike across the street from Gibbs Grocery in Washington, North Carolina. This area of Washington is known as "the block." Cox testified that he was talking to several other individuals who were standing at the block when Defendant pulled up his vehicle to the curb and exited the vehicle. Defendant, who was carrying a gun, approached Cox and stated, " 'Don't I know you?' " When Cox responded that he did not know Defendant, Defendant asked Cox where he was from and called Cox by a wrong name. Defendant then stated, " 'I do know you,' " and proceeded to shoot Cox in his side. After Defendant shot Cox, Cox ran to an area nearby the scene of the shooting and waited for medical assistance to arrive. An ambulance arrived several minutes later and Cox was transported to the hospital. As a result of his gunshot wound, a portion of Cox's liver was removed and he was hospitalized for approximately four days.

Tony Sinclair (Sinclair) testified for the State that he was standing in front of Gibbs Grocery with Tiran Gray (Gray) on the evening of 21 February 1997, when he heard a gunshot fired in the area. Sinclair then saw Defendant, who was carrying a gun, walking in the direction of Sinclair and Gray. As Defendant approached where Sinclair and Gray were standing Defendant stated, " 'Do [sic] anybody want it.' " When no one responded to Defendant, he shot Gray. Gray then ran away from Defendant while holding his side. As Gray was running, he said, " '[P]lease don't shoot me no more.' " Defendant

STATE v. GODLEY

[140 N.C. App. 15 (2000)]

then followed behind Gray and shot him a second time. After the second shot, Gray fell to the ground and began crawling away from Defendant. Gray continued to ask Defendant not to shoot him anymore, and Defendant shot Gray five or six more times. Defendant then threw the gun to the ground and stood in the street until a police officer arrived at the scene. Gray was transported by ambulance to the hospital; however, he did not survive the shooting.

M.G.F. Gilliland (Dr. Gilliland), a forensic pathologist, testified she performed an autopsy on Gray. She testified Gray had gunshot wounds on his left leg, left arm, left side, buttocks, pelvis, and right shoulder. In Dr. Gilliland's opinion, Gray died as a result of gunshot wounds to his trunk, arm, and leg.

Brad Brantley (Officer Brantley), an officer with the Washington Police Department, testified that on the evening of 21 February 1997, he was driving his patrol car when he responded to a call of "shots fired" in the area of Gibbs Grocery. Officer Brantley drove to the area of the shooting and parked his patrol car in front of Gibbs Grocery. After exiting his patrol car, Officer Brantley immediately saw Defendant walking toward him. When Defendant approached Officer Brantley, Officer Brantley asked him "what was happening." Defendant responded, "I shot him. I shot the mother f-----." Officer Brantley asked Defendant where his gun was located, and Defendant responded that he did not know. Officer Brantley then placed Defendant under arrest and drove him to the Washington Police Department.

Officer Brantley testified that after arriving at the Washington Police Department, he began to fill out an arrest report on Defendant. While Officer Brantley was asking Defendant his name, address, and other general information required for the arrest report, Defendant asked whether both victims had been rescued. Defendant told Officer Brantley that one of the victims had gone in the direction of Ninth Street, and Officer Brantley was later notified that Cox was found in the direction of Ninth Street.

Defendant presented evidence at trial that in January of 1997, Defendant and his girlfriend were assaulted and robbed in their home by two men. Defendant did not contact the police department regarding this incident because it was drug-related; however, Defendant did attempt to find out who had robbed him. Defendant believed some of the people who met at the block knew he had been robbed. On 21 February 1997, Defendant took a gun from his home and went to the

block to "ask about [his] money." When Defendant arrived at the block, he walked toward Gibbs Grocery where he saw a man he believed might have been one of the robbers. Defendant asked the man whether he knew who Defendant was, and when the man did not answer Defendant "raised up [his] hand and the gun went off." Defendant then saw people walking toward him and "the gun raised and [he] shot."

Defendant testified during cross-examination that the gun was a "45" and that he did not recall the brand of the gun. The State then approached an investigating officer who was in the courtroom and requested his gun. The investigating officer removed the clip from his gun and gave it to the State. The State then approached Defendant and asked whether the investigating officer's gun "looked like" the gun Defendant used in the shootings. Defendant responded that Defendant's gun "[c]ould have been a little bigger." The State proceeded to ask Defendant several questions regarding Defendant's use of the gun Defendant had possession of on 21 February 1997, and the State used the investigating officer's gun to illustrate Defendant's testimony. Specifically, the State questioned Defendant regarding the procedures necessary for firing the gun, including loading the gun, pulling back the gun's "lever," and pulling the trigger. Defendant objected to the exhibition of the investigating officer's gun on the ground the exhibition was "entirely prejudicial and inflammatory to the jury"; however, the trial court overruled Defendant's objection. The State did not offer the investigating officer's gun into evidence at any time during the trial.

William Byron Scarborough, Jr. (Dr. Scarborough), an expert in forensic psychology, testified that he conducted several tests on Defendant subsequent to the shootings. Based on these tests, Dr. Scarborough determined that on 21 February 1997, Defendant was experiencing cognitive disorganization and psychological distress. Dr. Scarborough testified these psychological factors "would have interfered with [Defendant's] ability to . . . make decisions, to process information, to think things through." Additionally, Defendant was experiencing depression, anxiety, and suspiciousness of others at the time of the shootings. Defendant's suspiciousness of others would "probably lead [Defendant] to misinterpret what other people are doing." Finally, on 21 February 1997, Defendant's "perceptual accuracy" had deteriorated, preventing Defendant from "accurately seeing and perceiving and interpreting what's going on around [him]." Dr. Scarborough concluded that at the time of the shootings Defendant's

"psychological abilities were significantly impaired" and Defendant did not have "the capacity to clearly and accurately think-through and plan action."

During his closing argument to the jury, Defendant conceded to the jury his guilt of second-degree murder, pursuant to *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986).

### Jury instructions

During the charge conference, Defendant requested the trial court instruct the jury on "reasonable doubt" and, specifically, requested the definition of "reasonable doubt" found in North Carolina Pattern Jury Instruction 101.10.[1] Although the trial court did instruct the jury on the meaning of "reasonable doubt," it denied Defendant's request to use the pattern jury instruction's definition and instead instructed the jury as follows:

> A reasonable doubt is not a mere possible doubt, for most things that relate to human affairs are open to some possible or imaginary doubt, but rather a reasonable doubt is a fair doubt, based on reason and common sense, and growing out of some of the evidence or lack of evidence in the case.

### Sentencing phase

Subsequent to its deliberations, the jury found Defendant guilty of first-degree murder and assault with a deadly weapon inflicting serious injury. During the sentencing phase, the State recited to the trial court that Cox and Gray incurred expenses totaling $20,008.48 as a result of Defendant's actions, including medical and funeral expenses. The State did not provide any additional evidence regarding these expenses.

Prior to the trial court's pronouncement of Defendant's sentences, Defendant apologized to the families of Gray and Cox "for the pain [he had] caused [them]." The trial court then proceeded to sentence Defendant for his assault conviction. The trial court found as an

---

1. North Carolina Pattern Jury Instruction 101.10 provides:

> A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

N.C.P.I., Crim. 101.10.

aggravating factor, pursuant to N.C. Gen. Stat. § 15A-1340.16(d)(14), that the offense involved "damage causing great monetary loss." Additionally, the trial court failed to find as mitigating factors that Defendant "voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer," pursuant to N.C. Gen. Stat. § 15A-1340.16(e)(11), and Defendant "has accepted responsibility for [his] criminal conduct," pursuant to N.C. Gen. Stat. § 15A-1340.16(e)(15).

---

The issues are whether: (I) the trial court abused its discretion during *voir dire* by restricting Defendant's questions to prospective jurors regarding their general interests, feelings regarding alcohol and gun use, and relationships to other prospective jurors; (II) the State's use of a gun to illustrate Defendant's testimony was relevant pursuant to Rule 401 of the North Carolina Rules of Evidence and, if not, whether the erroneous exhibition of the gun resulted in prejudicial error; (III) the trial court's instruction to the jury regarding the meaning of "reasonable doubt" violated Defendant's due process rights under the United States Constitution; (IV) the only reasonable inference that can be drawn from the evidence is that Defendant "voluntarily acknowledged wrongdoing," N.C.G.S. § 15A-1340.16(e)(11) (1999), and "accepted responsibility for [his] criminal conduct," N.C.G.S. § 15A-1340.16(e)(15) (1999); and (V) the trial court's finding as an aggravating factor, pursuant to N.C. Gen. Stat. § 15A-1340.16(d)(14), that Defendant's assault on Cox involved "damage causing great monetary loss" is error when the evidence of monetary loss shows only loss caused by medical expenses.

I

[1] Defendant argues the trial court's refusal to allow questions posed by Defendant to prospective jurors during *voir dire* "denied [D]efendant the opportunity to intelligently exercise his peremptory challenges, to ascertain the existence of bias justifying challenges for cause, and to secure an impartial jury." We disagree.

"The purpose of *voir dire* is to ensure an impartial jury to hear defendant's trial." *State v. Gregory*, 340 N.C. 365, 388, 459 S.E.2d 638, 651 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). The questioning of prospective jurors enables counsel "to determine whether a basis for challenge for cause exists" and "enable[s] counsel to intelligently exercise peremptory challenges." *Id.* The extent and manner of questioning, however, is within the sound discretion of the

trial court, and the trial court's restriction of questions will not be overturned absent an abuse of discretion. *State v. Mash*, 328 N.C. 61, 63, 399 S.E.2d 307, 309 (1991); *see State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996) ("trial court may be reversed for an abuse of discretion only upon a showing that its ruling could not have been the result of a reasoned decision").

In this case, Defendant sought to question a prospective juror regarding the types of hobbies, television programs, and books she enjoyed. The trial court allowed questions regarding whether the prospective juror read books involving crime or law enforcement and whether she had "any particular interest in law enforcement or crime in general." The trial court refused, however, to allow questions regarding the general interests of the prospective juror. The trial court's restriction of this line of questioning, which it found resulted in Defendant "visiting with the jury or establishing a rapport with the jury," was not an abuse of discretion. *See State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980) (during *voir dire*, counsel should not "engage in efforts to indoctrinate, visit with or establish 'rapport' with jurors").

Additionally, during *voir dire*, the trial court restricted Defendant's questions to the prospective jurors regarding the use of firearms and alcohol. The trial court refused to allow as questions whether a prospective juror was "opposed to citizens owning and possessing firearms"; had "any prejudicial feelings about the use or possession of firearms"; and had "any particular feelings [or] prejudices against the use of alcohol." The trial court also refused to allow questioning, directed to the panel of prospective jurors, of whether they felt that "drinking or using alcohol [was] a sin or an evil thing to do." Defendant was, however, permitted to ask the panel whether any were "members of any anti-gun organizations" and whether any felt their decision regarding Defendant's guilt would be affected "if there were evidence that . . . [D]efendant had consumed some type of alcoholic beverage." Defendant, therefore, had an opportunity to obtain information about prejudices by the prospective jurors regarding gun and alcohol use. Accordingly, the trial court did not abuse its discretion by restricting questions regarding these views. *See State v. Leroux*, 326 N.C. 368, 384, 390 S.E.2d 314, 325 (trial court's restriction of questions not an abuse of discretion when defendant had an opportunity to gain the information sought by asking permitted questions), *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990); *Mash*, 328 N.C. at 63-64, 399 S.E.2d at 309 (trial court's refusal to allow questions

STATE v. GODLEY

[140 N.C. App. 15 (2000)]

regarding prospective juror's views on mental health experts and juror's personal experiences with alcohol not an abuse of discretion).

Finally, the trial court refused to allow Defendant to ask prospective jurors who had various relationships with other jurors on the panel, individually, whether their relationships would affect their deliberations. Defendant was, however, permitted to ask the prospective jurors who were acquainted with other prospective jurors whether they knew "any reason why [their] contact or association with that other party would have an influence upon [them] or affect [them] in any way in sitting on the jury and being fair and impartial." Because this permitted question was sufficient to determine whether the prospective jurors would be affected during deliberations by their relationships with other prospective jurors, the trial court's refusal to allow Defendant to ask individual jurors about the effect of these relationships was not an abuse of discretion. *See Leroux*, 326 N.C. at 384, 390 S.E.2d at 325.

II

[2] Defendant argues the State's exhibition of a gun during Defendant's cross-examination, used to illustrate Defendant's testimony, was improper because the exhibition of the gun was "irrelevant."

Defendant objected to the use of the gun at trial on the ground the use of the gun to illustrate the testimony of Defendant was "entirely prejudicial and inflammatory to the jury."[2] The issue of whether testimony regarding the gun was relevant, pursuant to Rule 401 of the North Carolina Rules of Evidence, is therefore not properly before this Court. *See* N.C.R. App. P. 10(b)(1) (objecting party must state "specific grounds for the ruling the party desired"). Nevertheless, in our discretion we address Defendant's argument.[3] N.C.R. App. P. 2.

*Relevancy*

Generally, any object, including a weapon, may be exhibited at trial for the purpose of illustrating the testimony of a witness pro-

2. Defendant states in his brief to this Court that he objected at trial to the use of the gun, "specifically contending no appropriate foundation had been laid." Our review of the record on appeal, however, does not reveal any objection by Defendant on the ground an appropriate foundation had not been laid.

3. Defendant also argues the State's use of the gun during cross-examination of Defendant "amounted to prosecutorial misconduct." Defendant, however, did not raise this issue in an assignment of error. Accordingly, this issue is not properly before this Court. N.C.R. App. P. 10(c)(1) (assignments of error "shall state plainly, concisely and without argumentation the legal basis upon which error is assigned").

vided the testimony regarding the object is relevant. *State v. See*, 301 N.C. 388, 391, 271 S.E.2d 282, 284 (1980); *State v. Willis*, 109 N.C. App. 184, 189, 426 S.E.2d 471, 474, *disc. review denied*, 333 N.C. 795, 431 S.E.2d 29 (1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). "[E]ven though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard . . . , such rulings are given great deference on appeal." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *disc. review denied and dismissal allowed*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 121 L. Ed. 2d 241 (1992).

In this case, the State, while cross-examining Defendant regarding the operation of the gun used in the shootings, used a gun belonging to an investigating officer in the courtroom to illustrate Defendant's testimony. Although Defendant testified the gun used in the shooting was a "45" that "[c]ould have been a little bigger" than the investigating officer's gun, the record contains no evidence regarding whether the investigating officer's gun was a "45." Because the evidence does not establish any relationship between the investigating officer's gun and the gun used by Defendant other than Defendant's gun "[c]ould have been a little bigger" than the investigating officer's gun, the State's exhibition of the investigating officer's gun was not relevant under Rule 401. The State's use of the gun to illustrate Defendant's testimony was, therefore, error. *See* N.C.G.S. § 8C-1, Rule 401.

### Exhibit

Even assuming the exhibition of the investigating officer's gun was relevant, the exhibition of the gun was nevertheless error because the gun was never introduced into evidence. Generally, an item must be introduced into evidence before it may be used to illustrate the testimony of a witness. *State v. Rich*, 13 N.C. App. 60, 63, 185 S.E.2d 288, 291 (1971) (photographs must be introduced into evidence before they may be used to illustrate testimony of witness), *cert. denied and appeal dismissed*, 280 N.C. 304, 186 S.E.2d 179 (1972); *State v. Burbank*, 59 N.C. App. 543, 545, 297 S.E.2d 602, 603 (1982) (identification card must be introduced into evidence before it may be used to illustrate testimony of witness). In practice, however, a party using an item not previously introduced into evidence during cross-examination to illustrate the testimony of a witness may be

unable to introduce the item during presentation of the opponent's case. *See* N.C.G.S. § 15A-1221(a) (1999) (providing for order of proceedings in a jury trial). In such cases, the item not previously introduced into evidence may be used to illustrate the testimony of a witness if the item is otherwise admissible under the North Carolina Rules of Evidence and with the further understanding that the party will introduce the item into evidence when permitted by the trial court. *See* N.C.G.S. § 15A-1226(b) (1999) ("judge in his discretion may permit any party to introduce additional evidence at any time prior to verdict"); *State v. Quick*, 323 N.C. 675, 682, 375 S.E.2d 156, 159-60 (1989) (trial court did not err by admitting during the State's presentation of rebuttal evidence an exhibit used by the State to cross-examine the defendant during the defendant's presentation of evidence).

### Prejudicial error

Defendant argues the exhibition of the investigating officer's gun was prejudicial error because Defendant's intent was contested by Defendant, and the State "used the [investigating] officer's gun in an effort to establish that [D]efendant knew exactly what he was doing and intentionally shot the victims." We disagree.

The erroneous admission of evidence requires a new trial only when the error is prejudicial. *State v. Locklear*, 349 N.C. 118, 149, 505 S.E.2d 277, 295 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). To show prejudicial error, a defendant has the burden of showing that "there was a reasonable possibility that a different result would have been reached at trial if such error had not occurred." *Id.*; N.C.G.S. § 15A-1443(a) (1999).

In this case, the State, exhibiting the investigating officer's gun as an example, asked Defendant several questions regarding the procedure for firing the gun used by Defendant. Defendant testified the gun would fire when it was loaded, the "lever" was pulled back, and the trigger was pulled. The exhibition of the investigator's gun by the State did not establish that Defendant knew the procedure for firing the gun that he used in the shootings; rather, this fact was established by Defendant's testimony regarding his use of his own gun. Accordingly, there is no reasonable possibility that a different result would have been reached at trial if the State had not exhibited the investigating officer's gun. The exhibition of the gun, therefore, was not prejudicial error.

## III

[3] Defendant argues the trial court's instruction to the jury did not properly define "reasonable doubt" and, therefore, violated Defendant's right to due process under the United States Constitution. We disagree.

In the absence of a request by a party, the trial court is not required to define "reasonable doubt" in its instructions to the jury. *State v. Hunt*, 339 N.C. 622, 643, 457 S.E.2d 276, 288 (1995). Further, when a definition is requested by a party, the trial court is not required to read verbatim the requested definition; rather, the definition used by the trial court in its instruction is sufficient if it is "in substantial accord with" a definition of "reasonable doubt" which has been found constitutional by the North Carolina Supreme Court. *Id.* at 643-44, 457 S.E.2d at 288.

In this case, Defendant requested the trial court instruct the jury on the definition of "reasonable doubt" found in North Carolina Pattern Jury Instruction 101.10. The trial court, however, declined to give the requested definition and instead gave an alternate definition. As the North Carolina Supreme Court has held this alternate definition of "reasonable doubt" is constitutional, *id.* at 643-44, 457 S.E.2d at 289, the trial court did not err by refusing to instruct the jury using the definition of "reasonable doubt" requested by Defendant.

## IV

[4] Defendant argues the trial court erred, in sentencing Defendant for his assault conviction, by failing to find as mitigating factors that Defendant "voluntarily acknowledged wrongdoing in connection with the offense," N.C.G.S. § 15A-1340.16(e)(11), and "accepted responsibility for [his] criminal conduct," N.C.G.S. § 15A-1340.16(e)(15). We disagree.

A defendant has the burden of proving by a preponderance of the evidence the existence of mitigating factors. *State v. Canty*, 321 N.C. 520, 523, 364 S.E.2d 410, 413 (1988). A trial judge is given "wide latitude in determining the existence of . . . mitigating factors," and the trial court's failure to find a mitigating factor is error only when "no other reasonable inferences can be drawn from the evidence." *Id.* at 524, 364 S.E.2d at 413.

N.C. Gen. Stat. § 15A-1340.16(e)(11) provides as a mitigating factor that "[p]rior to arrest or at an early stage of the criminal

process, the defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer." N.C.G.S. § 15A-1340.16(e)(11). A defendant "acknowledge[s] wrongdoing" when he admits "culpability, responsibility or remorse, as well as guilt." *State v. Rathbone*, 78 N.C. App. 58, 67, 336 S.E.2d 702, 707 (1985), *disc. review denied*, 316 N.C. 200, 341 S.E.2d 582 (1986).

In this case, Officer Brantley testified that when he arrived at the scene of the shooting, Defendant approached him and stated, "I shot him. I shot the mother f-----." Officer Brantley also testified that at the police station Defendant asked him whether both victims had been rescued. While this evidence shows Defendant was aware two people had been shot and that he had admitted to shooting one of these two people, a reasonable inference can be drawn that Defendant's statements did not amount to an admission of "culpability, responsibility or remorse, as well as guilt" for the shooting of Cox. The trial court, therefore, did not err by failing to find this mitigating factor.

Defendant also contends the trial court erred by failing to find as a mitigating factor that Defendant "accepted responsibility for [his] criminal conduct" pursuant to N.C. Gen. Stat. § 15A-1340.16(e)(15). N.C.G.S. § 15A-1340.16(e)(15). A defendant "accept[s] responsibility for [his] criminal conduct" when he accepts that he is "answerable [for] . . . the result" of his criminal conduct. *See Webster's Third New International Dictionary* 1935 (1968).

Defendant argues he accepted responsibility for his criminal conduct when he admitted to Officer Brantley that he had shot one of the victims. Assuming Defendant's statement is sufficient to show an acceptance of responsibility for his actions, a reasonable inference can be drawn that Defendant's statement that he "shot the mother f-----" related to the shooting of Gray and not the shooting of Cox. Defendant also argues he accepted responsibility for his criminal conduct when he testified at trial that he shot Cox. Defendant's testimony regarding the shooting of Cox, however, was that he "raised up [his] hand and the gun went off." This testimony does not show Defendant's acceptance of responsibility for shooting Cox; rather, it tends to show Defendant did not accept that he was answerable for the injuries of Cox. Additionally, Defendant argues he accepted responsibility for his criminal conduct when he "allowed his defense lawyers to concede his guilt of second-degree murder to the jury." This concession, which relates only to Defendant's role in Gray's death and not his assault on Cox, has no relation to Defendant's

alleged acceptance of responsibility for his assault on Cox. Finally, Defendant argues his apology to the families of Gray and Cox subsequent to his convictions amounts to an acceptance of responsibility for his criminal conduct. Defendant's apologetic statement, which he made after the return of the jury's verdicts, is not so persuasive that Defendant's acceptance of responsibility for his conduct is the only reasonable inference that can be drawn from the statement. *See Canty*, 321 N.C. at 524, 364 S.E.2d at 413 (trial court is given discretion in determining existence of mitigating factor because it has the opportunity to observe the witnesses' demeanor). Accordingly, the trial court did not err by failing to find this mitigating factor.

V

**[5]** Defendant argues and the State concedes that the trial court erred, in sentencing Defendant for his assault conviction, by finding as an aggravating factor that the offense involved "damage causing great monetary loss," pursuant to N.C. Gen. Stat. § 15A-1340.16(d)(14). We agree.

N.C. Gen. Stat. § 15A-1340.16(d)(14) (1999) provides as an aggravating factor that the offense involved "damage causing great monetary loss." N.C.G.S. § 15A-1340.16(d)(14). The "monetary loss," however, must "result[] from damage to property." *State v. Bryant*, 318 N.C. 632, 635, 350 S.E.2d 358, 360 (1986) (interpreting the meaning of this statutory factor under the Fair Sentencing Act).

In this case, there is no evidence Defendant's assault on Cox resulted in damage to Cox's property causing a monetary loss. The trial court, therefore, erred by finding this aggravating factor. Accordingly, Defendant's sentence for his assault conviction is vacated and this case is remanded for resentencing on this conviction. *See id.* at 637, 350 S.E.2d at 361.

Trial: No error.

Sentence for assault conviction: Vacated and remanded.

Judge SMITH concurs.

Judge EDMUNDS concurs in the result with a separate opinion.

STATE v. GODLEY

[140 N.C. App. 15 (2000)]

Judge EDMUNDS concurring in the result.

Although I concur in the result, I disagree with the majority's analysis in Part II relating to the prosecutor's display of a weapon to defendant during cross-examination. Defendant denied the element of intent as to one of the charges. Specifically, he admitted that victim Cox was shot, but claimed on direct examination, "I raised the gun, and it went off." Because defendant was charged with assault on Cox with a deadly weapon with intent to kill, inflicting serious injury, his intent was an element to be proved by the State. By contrast, defendant's testimony as to shooting victim Gray was more specific in that defendant stated he "shot the gun." Accordingly, when defendant continued to maintain on cross-examination that the shooting of Cox happened when the gun "went off," the State was permitted to explore defendant's suggestion that this shooting was not intentional.

Defendant admitted that the pistol he carried the night of the shooting was a semi-automatic. This weapon was never recovered. It appears from the record that while cross-examining defendant, the prosecutor borrowed a semi-automatic pistol from the investigating officer, displayed it to defendant, and went through the steps with defendant necessary to load, cock, and fire a semi-automatic pistol. At each point, the prosecutor asked defendant if the action taken in court with the borrowed pistol illustrated the action necessary to accomplish the same result with defendant's pistol. Therefore, the prosecutor's questions established defendant's familiarity with semi-automatic weapons. The pistol was not shown for the purpose of suggesting that the two weapons were of similar caliber or appearance, and the State never contended that the pistol shown during cross-examination was the same one that defendant used to shoot Cox. This use of the borrowed pistol to illustrate relevant characteristics of another weapon was proper. *See State v. See*, 301 N.C. 388, 271 S.E.2d 282 (1980) (holding no error where firearm similar to that used in robbery displayed to jury); *State v. Reaves*, 132 N.C. App. 615, 513 S.E.2d 562 (holding no error when prosecutor displayed revolver and semi-automatic pistol to illustrate differences between the two types of guns), *disc. review denied*, 350 N.C. 846, —— S.E.2d —— (1999). In turn, the process of loading, cocking, and firing a semi-automatic pistol was relevant to defendant's contention that the shooting of Cox was not intentional. *See* N.C. Gen. Stat. § 8C-1, Rule 401 (1999).

I agree with the majority that a clearer foundation would have been preferable. The record does not reflect the type of weapon being

used to illustrate defendant's testimony, nor does it establish the grounds for which the weapon was being shown to defendant. Nevertheless, I contend that the prosecutor's use of a semi-automatic pistol during cross-examination of defendant to illustrate the operation of such a weapon was proper to challenge defendant's suggestion that the shooting of Cox was not intentional. I concur in all other aspects of the majority opinion.