STATE OF NORTH CAROLINA v. TIMOTHY GLENN SMITH

No. COA01-963

(Filed 6 August 2002)

**1. Homicide— short-form indictment—constitutional**

The short form murder indictment is constitutional.

**2. Evidence— other crimes or acts—integral part of offense**

The trial court did not err in a prosecution for first-degree murder, armed robbery, and first-degree burglary by allowing defendant's wife to testify about his actions the day before, the day of, and the day after the murder, burglary, and robbery. The events of that weekend form an integral and natural part of the account of the crime and are necessary to complete the story of the crime for the jury. Moreover, the State sought to establish as a motive stealing to support a crack habit.

**3. Evidence— hearsay—statements by murder victim— present sense impression**

The trial court did not err in a prosecution for first-degree murder, armed robbery, and first-degree burglary by admitting the testimony of a pawn shop employee about statements made by the victim during a confrontation with defendant in the pawn shop. The statements were made as the victim witnessed the events and were therefore admissible as a present sense impression. N.C.G.S. § 8C-1, Rule 803(1).

**4. Evidence— murder victim's statements—observation of victim's mental state—not present sense impression**

The trial court did not err in a prosecution for first-degree murder, armed robbery, and first-degree burglary by admitting the testimony of the victim's daughter and niece regarding statements the victim made after a pawn shop confrontation over stolen goods where the statements were not sufficiently immediate to be a present sense impression, but were admissible as non-hearsay testimony relating the witnesses' observation of the mental state of the victim. N.C.G.S. § 8C-1, Rule 701.

**5. Evidence— videotape of murder victim—admissible**

The trial court did not err in a prosecution for first-degree murder, armed robbery, and first-degree burglary by admitting a videotape of the corpse and the area where it was found. After a

voir dire, the court limited the playing of the tape before the jury, and a witness testified at trial that the videotape was an accurate description of the body as he found it and answered eight questions about the crime scene. The tape was not admitted solely to arouse the passions of the jury.

**6. Constitutional Law— effective assistance of counsel—failure to object to videotape**

Defense counsel did not provide ineffective assistance of counsel in a prosecution for first-degree murder, armed robbery, and first-degree burglary by not objecting to the admission of a videotape of the body and not requiring the State to authenticate the videotape.

**7. Criminal Law— instructions—duress**

The trial court did not err in a prosecution for first-degree burglary and armed robbery by denying defendant's request for an instruction on duress where defendant had ample opportunity to avoid participation and made no attempt to contact police or surrender the stolen goods.

**8. Criminal Law— instructions—doctrine of recent possession**

The trial court did not err by instructing the jury on the doctrine of recent possession in a prosecution for burglary and robbery where defendant maintained that there was significant evidence of intervening agency. By its nature, the doctrine involves a gap in the evidence of possession of the stolen goods.

Appeal by defendant from judgment entered 4 October 2000 by Judge Thomas W. Seay, Jr. in Robeson County Superior Court. Heard in the Court of Appeals 15 May 2002.

*Roy Cooper, Attorney General, by Francis W. Crawley, Special Deputy Attorney General, for the State.*

*Bowen, Berry, Powers and Slaughter, PLLC, by Sue Genrich Berry, for defendant-appellant.*

THOMAS, Judge.

Defendant, Timothy Glenn Smith, appeals from convictions of first-degree murder, robbery with a dangerous weapon, and first-degree burglary.

**STATE v. SMITH**

[152 N.C. App. 29 (2002)]

Defendant sets forth nine assignments of error. For the reasons herein, we find no error.

The State's evidence tends to show the following: On 19 January 1999, defendant pawned a skill saw and socket wrench at Bryant's Gun and Pawn. They had been stolen from Ethel Mae Todd, defendant's seventy-two-year-old landlord. Ms. Todd went to the pawn shop the next day in search of the items, with defendant walking in while she was still there. He redeemed the items upon her demand, but then an argument erupted. Defendant told Ms. Todd, "I'll get you one way or another." Ms. Todd informed defendant he had to move out of the mobile home he rented from her within fifteen days.

Shortly thereafter, defendant, his wife Linda Smith, and five-year-old son moved out of the mobile home. Ms. Smith's cousin, Shelby Grant, and her husband Billy Grant, helped the Smiths move their belongings. Mr. Grant testified that during the moving, defendant, referring to Ms. Todd, said, "I will get even with that bitch; I will kill her."

Ms. Todd called her daughter, Paula Lee Todd, the same day as the pawn shop incident and explained what had occurred. To calm her mother, Paula Todd stayed at her mother's home every weekend thereafter until the weekend of 10 and 11 April 1999. Ms. Todd was killed in her home sometime during the late night hours of Sunday, 11 April 1999, or early morning hours of Monday, 12 April 1999.

Prior to Ms. Todd's death, but during the same weekend, defendant tied up his wife with a telephone cord and threatened to kill her with an ice pick after she asked him about their missing VCR. Defendant then forced his wife and son to ride with him to buy crack cocaine, which he purchased using money taken from Ms. Smith's wallet. At one point, defendant drove back home, retrieved a different VCR, sold it to a woman for twenty dollars, and used the money to buy even more crack cocaine. During these events, defendant repeatedly threatened to kill his wife with a knife. On that Sunday, defendant sold more items from the home, including the washer and dryer. Thereafter, Ms. Smith took their son and left. She pressed charges the next day against defendant for assault, with defendant being arrested and spending Monday night in jail.

On Monday morning, employees of a paving company saw the naked body of an elderly woman in a sitting position on the side of the road in Robeson County. After determining she was dead, they contacted law enforcement. The body was that of Ms. Todd. Her head had

received blows to the side and around the face. Four stab wounds had penetrated her chest, damaging the heart and left lung.

State Bureau of Investigation Agent Domingo A. Isasi went to defendant's home and interviewed him there on Tuesday, 13 April 1999. Defendant told him that he and his family had eaten lunch at his parent's on Sunday, he and his wife had argued, and shortly after they returned home, the Grants arrived. His wife then left with the Grants. He further stated that he went to sleep Sunday around 10 p.m. and was awakened early the next morning when someone came by to take him to work. However, he decided not to go.

Isasi left without arresting defendant.

On Friday, 16 April 1999, defendant asked a co-worker to ride with him to his home to unload some items from his car. Once there, defendant asked the co-worker if he wanted to move in with him. When the co-worker replied that he did not, defendant said, "Why, you don't want to live with a murderer?" The same day, due to inconsistencies discovered in defendant's statement, Isasi again interviewed defendant. Confronted with the inconsistencies, defendant stated that everyone was lying except him. Defendant was then arrested for the murder of Ms. Todd.

While being processed at the police station after his arrest, defendant said he wanted to make another statement. Defendant was advised of his *Miranda* rights, and he then admitted that after selling the washer and dryer, he went with Michael Moore to purchase drugs. Moore lived in Ms. Todd's mobile home park. Afterwards, he said, he returned home and went to sleep. Defendant stated several times that he did not remember killing "that lady."

Approximately an hour later, defendant told Isasi he would like to give another statement. Defendant said that on Monday, 12 April 1999, he used money from selling his washer and dryer to purchase and smoke crack cocaine with Moore. He rode with Moore to Ms. Todd's home because Moore wanted to get rent money back from her. While defendant stayed in the van, Moore kicked down Ms. Todd's door. Defendant then walked into the house and saw Moore stabbing Ms. Todd with a hunting knife. Defendant tried to stop him, but was overpowered. Moore threatened to kill defendant's wife and son if defendant said anything.

Defendant continued to explain that Moore put Ms. Todd's body in the trunk of the car, made defendant drive to a wooded area, and

placed the body on the side of the road. They then went back to Ms. Todd's house, where Moore took three guns from a gun rack and made defendant take jewelry from the bedroom. Defendant walked home after Moore told him to go there, wait, and not call anyone. About thirty minutes later, Moore drove to defendant's home and gave defendant a ring and some crack cocaine. He again told defendant not to tell anyone about what had happened. Sometime later, Moore returned to defendant's home and gave him the guns and a watch that he wanted defendant "to get rid of." Defendant sold the ring the next day for ten dollars. He also sold the guns to his supervisor at work because, he said, it was what Moore wanted.

Defendant's evidence tends to show that Ms. Todd was not satisfied with his explanation that he pawned her items only because he needed extra money during the week and intended to redeem them on Friday. She ordered him to leave her park, and defendant agreed to move within fifteen days. He did not threaten her in any way.

On 10 April 1999, defendant saw his wife at the home of an ex-boyfriend. They discussed the situation but defendant denied striking, tying up, or threatening Ms. Smith.

After returning from his mother's home, defendant's family found the Grants in their driveway. The Grants took the Smith's son with them and Ms. Smith went to her mother's. When Ms. Smith did not return home later in the day, defendant went to retrieve his son from the Grants. No one was there. Upon returning home, defendant found his wife and Ms. Grant removing some items.

To keep his wife from getting the washer and dryer, defendant sold them to his neighbor for $100.00. He purchased cocaine with some of that money. He and Moore used the cocaine together. Moore then decided to get back his rent money from Ms. Todd. The rest of defendant's evidence comports with his last statement to Isasi.

Defendant was convicted in a jury trial and sentenced to life imprisonment without parole for first-degree murder; 117 to 150 months for robbery with a dangerous weapon to be served at the expiration of the life sentence; and 117 to 150 months for first-degree burglary to be served at the expiration of the sentence imposed for robbery. He appeals.

[1] By his first, second, and third assignments of error, defendant contends the charge of first-degree murder should be dismissed because the short-form murder indictment is constitutionally insuffi-

cient to charge him with the crime. He maintains it fails to allege all of the elements of murder, specifically, premeditation, deliberation, and a specific intent to kill. As a result, defendant argues, when the trial court tried him for first-degree murder it: (1) lacked jurisdiction; and (2) violated his constitutional rights.

Defendant acknowledges that this precise issue has been decided against his position. *See State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000) (holding the short-form murder indictment constitutional under both the North Carolina and United States Constitutions), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Wallace*, 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43 (same), *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000), *reh'g denied*, 531 U.S. 1120, 148 L. Ed. 2d 784 (2001); *State v. Nolen*, 144 N.C. App. 172, 186, 550 S.E.2d 783, 792 (same), *appeal dismissed and disc. review denied*, 354 N.C. 368, 557 S.E.2d 531 (2001). Additionally, in *State v. Braxton*, our Supreme Court also held that the short-form murder indictment authorized by N.C. Gen. Stat. § 15-144 (2001) gives a defendant notice that he is charged with first-degree murder and that the maximum penalty to which he could be subject is death. *Braxton*, 352 N.C. at 175, 531 S.E.2d at 438. Nonetheless, defendant asks this Court to reexamine the issue. As we are bound by the decisions of the Supreme Court, *see Rogerson v. Fitzpatrick*, 121 N.C. App. 728, 732, 468 S.E.2d 447, 450 (1996), as well as those already decided by other panels of this Court, *see In the Matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 36-37 (1989), we refuse to do so. Accordingly, we overrule these assignments of error.

**[2]** By his fourth assignment of error, defendant contends the trial court erred in allowing his wife to testify about his actions the day before, of, and after the murder, burglary, and robbery. We disagree.

Rule 404(b) provides that evidence of other offenses is inadmissible if its only relevancy is to "prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2001). The Rule is one of inclusion, and thus only requires the exclusion of evidence if its sole probative value is to show that the defendant has the propensity to commit an offense of the nature of the crime charged. *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Rule 404(b) explicitly lists motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident, as purposes for which evidence may be admissible. N.C. Gen. Stat. § 8C-1, Rule 404(b). Although not enumer-

ated in Rule 404(b) itself, evidence may also be admitted to establish a chain of circumstances leading up to the crime charged:

> Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

State v. Agee, 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990) (quoting United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985)).

Here, the testimony of Ms. Smith establishes that defendant acted abusively toward her, repeatedly threatening, first with an ice pick and then a knife, to "take her out." This behavior began after she confronted him about a missing VCR. She further testified that after purchasing some crack cocaine with money from her wallet, defendant sold a different VCR from their home and used that money to buy more crack cocaine. These events started on Saturday, 10 April, and continued through Monday, 12 April, which was the day of or following Ms. Todd's murder.

We find no error in the admission of this testimony because it "pertained to the chain of events explaining the context, motive, and set-up of the crime." Agee, 326 N.C. at 548, 391 S.E.2d at 174. The events of that particular weekend form an "integral and natural part of an account of the crime," and are "necessary to complete the story of the crime for the jury." Id. Moreover, the State sought to establish that, besides revenge, defendant had a motive for going to Ms. Todd's home. He intended to steal objects he could sell for cash to support his crack cocaine habit. See N.C. Gen. Stat. § 8C-1, Rule 404(b). Accordingly, we reject this assignment of error.

[3] By his fifth assignment of error, defendant argues that the trial court erred in allowing inadmissible hearsay testimony of Paula Todd, Ms. Todd's niece Shirley Huggins, and a pawn shop employee, regarding statements Ms. Todd made while in the pawn shop with defendant and statements made later concerning the incident. We disagree.

Ms. Todd's statements in the presence of the pawn shop employee were properly allowed into evidence as a present sense impression by the declarant. This exception to the hearsay rule is defined as follows:

(1) Present Sense Impression—A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

N.C. Gen. Stat. § 8C-1, Rule 803(1) (2001). "The basis of the present sense impression exception is that closeness in time between the event and the declarant's statement reduces the likelihood of deliberate or conscious misrepresentation." *State v. Pickens*, 346 N.C. 628, 644, 488 S.E.2d 162, 171 (1997).

The pawn shop employee testified about Ms. Todd's statements to defendant after she found her stolen tools in the shop. Ms. Todd demanded that defendant pay for the tools and move out. She also told him several times, "Shut up," or "Hush." These statements were made as Ms. Todd witnessed the events, and therefore were admissible under the present sense impression exception.

[4] Paula Todd, meanwhile, testified that her mother called her at work on the day of the incident. She said her mother was very disturbed and quivering when she said, "Honey, I can't believe someone would do this to me," that they would have "broken in." According to Paula Todd, Ms. Todd told her that "a deputy had stayed with her all afternoon because he had felt for her safety."

Ms. Todd did not make these statements while she was perceiving the event. Therefore, they would be required to qualify as being made "immediately thereafter." There is no bright line rule regarding what time interval is too long to be "immediately thereafter;" admissibility depends on the facts of each case. *State v. Clark*, 128 N.C. App. 722, 725, 496 S.E.2d 604, 606 (1998). In *Clark*, the witness observed her son's behavior, and then walked next door to her daughter-in-law's house to tell her about it. The Court held that the statements were sufficiently close in time to be considered "immediately thereafter." *See id.*

Here, the record indicates only that Ms. Todd's statements were made the same day as the event, but after a police officer had stayed with her all afternoon. Under these facts, they would not qualify as being made "immediately []after" the event, as required by Rule 803(1), and were therefore not admissible under this hearsay exception.

Likewise, the testimony of Huggins also does not come under Rule 803(1). There is no indication in the record regarding when Ms.

Todd spoke to her niece about the incident, except that the two spoke "almost daily." Moreover, Huggins did not testify about any statements Ms. Todd made regarding the incident. Rather, she testified only that her aunt had told her about the incident and that it "made her nervous and upset her."

The testimony of both witnesses, however, is admissible *non-hearsay* testimony. Rule 701 of the North Carolina Rules of Evidence provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or determination of a fact in issue.

N.C. Gen. Stat. § 8C-1, Rule 701 (2001). Our courts have long held that: "The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence." *State v. Leak*, 156 N.C. 643, 647, 72 S.E.2d 567, 568 (1911) (quoting John Jay McKelvey, *Handbook of the Law of Evidence* § 132 (rev. 2d ed. 1907)). Therefore, Paula Todd and Huggins were permitted to testify, based on their personal observations, about the mental state of Ms. Todd shortly after the pawn shop confrontation.

**[5]** By defendant's sixth assignment of error, he contends the trial court committed plain error in allowing the jury to view a videotape of Ms. Todd and the area surrounding her body. He argues: (1) the videotape is unnecessarily gruesome; and (2) a proper foundation was not shown for its admission. Defendant raises these arguments for the first time on appeal. Therefore, we review them for plain error. N.C.R. App. P. 10(c)(4).

Plain error is "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or . . . grave error which amounts to a denial of a fundamental right of the accused[.]" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *U.S. v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982). In order to prevail under a plain error analysis, a defendant must show: (1) there was error; and (2) without this error, the jury would probably have

reached a different verdict. *State v. Faison*, 330 N.C. 347, 361, 411 S.E.2d 143, 151 (1991).

In determining whether to admit photographic evidence, the trial court must weigh the probative value of the photographs against the danger of unfair prejudice to a defendant. N.C. Gen. Stat. § 8C-1, Rule 403 (2001). Such evidence, however gruesome, is admissible if it serves to illustrate the testimony of a witness, and so long as an excessive number of photographs are not used solely to arouse the passions of the jury. *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988).

The requirement that the offeror lay a proper foundation for a videotape can be met by:

> (1) testimony that the motion picture or videotape fairly and accurately illustrates the events filmed (illustrative purposes); (2) "proper testimony concerning the checking and operation of the video camera and the chain of evidence concerning the videotape . . ."; (3) testimony that "the photographs introduced at trial were the same as those [the witness] had inspected immediately after processing," (substantive purposes); or (4) "testimony that the videotape had not been edited, and that the picture fairly and accurately recorded the actual appearance of the area 'photographed.' "

*State v. Cannon*, 92 N.C. App. 246, 254, 374 S.E.2d 604, 608-09 (1988), *rev'd on other grounds*, 326 N.C. 37, 387 S.E.2d 450 (1990). Here, the trial court conducted a *voir dire* concerning the admission of the tape. Defendant's counsel, who had previously viewed the tape and made a written motion opposing its admissibility on the basis that it was gruesome and inflammatory, objected during the *voir dire*. The trial court then viewed a portion of the tape, asked if that was all that would be shown to the jury, ordered no volume to be played, and ruled the portion of the tape admissible "if it illustrates and explains the testimony."

John Collins then testified that he found a naked woman's body in a sitting position on top of metal bars on the side of a road. He stated that the videotape, which he had previously viewed, was an accurate depiction of how he found the body. He then used the tape while answering eight "yes or no" questions regarding the location of objects and the body at the crime scene. Accordingly, it was not admitted into evidence "solely to arouse the passions of the jury." *Id.*

We hold that the videotape, offered and received solely for illustrative purposes, met the test enunciated in *Cannon*.

**[6]** By defendant's seventh assignment of error, he contends his trial counsel provided ineffective assistance of counsel by failing: (1) to object to the videotape at trial; and (2) to require the State to authenticate the videotape. Defendant claims he was prejudiced by the viewing of the videotape and was further prejudiced by the more strenuous plain error analysis applied to the previous assignment of error. We disagree. As a result of our holding that there was no error regarding the use of the videotape, defendant is also unable to meet his burden of showing that counsel was ineffective, or fell below an objective standard of reasonableness. *See State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (defendant must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, and that they were so serious as to deprive defendant of a fair trial) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, *reh'g denied*, 467 U.S. 1267, 82 L. Ed. 2d 864 (1984)) .

**[7]** By his eighth assignment of error, defendant contends the trial court erred as a matter of law in denying defendant's request to instruct the jury on the defense of duress to the charges of first-degree burglary and robbery with a dangerous weapon because he claims Moore forced him to commit the crimes. He maintains the evidence establishes the elements of the defense. We disagree.

"In order to have the court instruct the jury on the defense, the defendant must present some credible evidence on every element of the defense." *State v. Henderson*, 64 N.C. App. 536, 540, 307 S.E.2d 846, 849 (1983).

> [T]o constitute a defense . . . the coercion or duress must be present, imminent or impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done. Furthermore, the doctrine of coercion cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm.

*State v. Kearns*, 27 N.C. App. 354, 357, 219 S.E.2d 228, 230-31 (1975), *disc. review denied*, 289 N.C. 300, 222 S.E.2d 700 (1976). Moreover, once the crimes were committed under duress and the defendant was out from under Moore's coercive influence, defendant had a duty to

surrender himself and the stolen goods to the police. *Henderson*, 64 N.C. App. at 540, 307 S.E.2d at 849. Defendant must satisfy this element as well before he is entitled to an instruction on the defense of duress. *Id*.

Here, the evidence, considered in defendant's favor, shows that he had ample opportunity to avoid participation with Moore in the burglary and robbery, "without undue exposure to death or serious bodily harm." Defendant stated that he knew Moore was going to Ms. Todd's house to get money. Rather than flee, defendant sat in the van while Moore kicked in the kitchen door and went inside. Defendant himself then went inside and witnessed the stabbing. While Moore was tying up the victim, defendant did not leave. Instead, he stood and watched until Moore came over to him and, with a knife, threatened to kill defendant and his family. Defendant made no attempt to leave while they disposed of the body, and then assisted Moore in taking the guns and jewelry. Finally, he made no attempt to contact the police or surrender the stolen goods, but instead sold them. Accordingly, defendant's evidence fails to establish the defense of duress and we reject this assignment of error.

[8] By his final assignment of error, defendant contends the trial court erred in instructing the jury on the doctrine of recent possession regarding the burglary and robbery charges. We disagree.

> It is well established that the "possession of stolen property recently after the theft, and under circumstances excluding the intervening agency of others, affords presumptive evidence that the person in possession is himself the thief, and the evidence is stronger or weaker, as the possession is nearer to or more distant from the time of the commission."

*State v. Joyner*, 301 N.C. 18, 28, 269 S.E.2d 125, 132 (1980) (quoting *State v. Patterson*, 78 N.C. 470, 472-73 (1878)). Here, the uncontradicted evidence shows that defendant was present during the burglary and robbery of Ms. Todd's home and that he sold the three guns on Monday and the ring on Tuesday. Nevertheless, defendant maintains the instruction was erroneous because there was significant evidence of the intervening agency of Moore. In *State v. Warren*, this Court stated:

> By its very nature, the doctrine is useful only when the defendant's guilt cannot be established by direct evidence of his

presence at the scene of the crime and of his participation therein. Thus, where the doctrine is invoked, there must always be a slight gap in the State's evidence failing to completely account for the possession of the stolen goods at every moment between the actual commission of the crime and the discovery of the goods in a defendant's possession, thereby making it impossible to completely exclude the possibility of some intervening agency.

*Warren,* 35 N.C. App. 468, 473, 241 S.E.2d 854, 858, *disc. review denied,* 295 N.C. 94, 244 S.E.2d 262 (1978).

We therefore reject defendant's argument.


NO ERROR.


JUDGES WYNN and HUNTER concur.