STATE OF NORTH CAROLINA v. ANTWAN MAURICE SANDERS

No. COA09-443

(Filed 5 January 2010)

**1. Criminal Law— jury instructions—duress—insufficient evidence**

The trial court did not err in a prosecution for, *inter alia,* first-degree kidnapping and robbery with a dangerous weapon by refusing to instruct the jury on the defense of duress. Defendant's testimony did not show that his actions were caused by a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act.

**2. Criminal Law— motion for mistrial denied—evidence of polygraph examination nonprejudicial**

The trial court in a prosecution for first-degree kidnapping, robbery with a dangerous weapon, first-degree sexual offense, and murder did not abuse its discretion by denying defendant's motion for a mistrial. Although the Court of Appeals disapproved of the State submitting to the jury exhibits containing references to a polygraph examination administered to a witness, admission of the exhibits was not prejudicial error as the exhibits did not contain evidence of the results of the polygraph examination.

**3. Criminal Law— prosecutor's closing argument—intervention not required**

The trial court in a prosecution for first-degree kidnapping, robbery with a dangerous weapon, first-degree sexual offense, and murder did not err by failing to intervene *ex mero motu* during the prosecutor's closing arguments because the prosecutor's comments were not so grossly improper as to require the trial court's intervention.

## 4. Criminal Law— prosecutor's closing argument—trial court's instruction—prejudice cured

The trial court in a first-degree kidnapping, robbery with a dangerous weapon, first-degree sexual offense, and murder prosecution did not abuse its discretion by overruling defendant's objection to the prosecutor's characterization of the law made during closing arguments. The trial court's subsequent instruction cured any prejudice from the prosecutor's comments.

Appeal by defendant from judgments entered 19 August 2008 by Judge David S. Cayer in Mecklenburg County Superior Court. Heard in the Court of Appeals 13 October 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General Diane A. Reeves, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Andrew DeSimone, for defendant-appellant.*

BRYANT, Judge.

Defendant Antwan Sanders appeals from judgments and commitments entered after a jury found him guilty of two counts of first-degree murder, two counts of first-degree kidnapping, and first-degree sexual offense. For the reasons stated herein, we find no prejudicial error.

### Facts

In June 1993, defendant was eighteen years old and resided in Mount Holly, North Carolina. During the evening of 2 June, defendant met twenty-two year old Myron Burris and nineteen year old Robert Friday. Defendant and Burris often met after school to "smoke weed and drink and whatnot . . . ." Defendant and Friday were mere acquaintances.

Burris knew of a drug dealer in Charlotte they could rob of his drugs. The dealer was a "[l]aid back dude, didn't carry no gun. . . . It [would be] like taking candy from a baby, all [they] had to do was get up in the house." Defendant knew only that the dealer resided on the south side of Charlotte, approximately thirty minutes from Mount Holly. The three agreed to the robbery. All three entered Friday's grey Nissan Sentra.

While riding, they stopped at a convenience store for beer, cigarettes, and rolling papers. For forty minutes, Burris and Friday

smoked marijuana, and in the back seat, defendant smoked marijuana laced with crack cocaine. Defendant later testified that Friday carried a .32 caliber revolver, Burris a .38 caliber revolver, and defendant, himself, carried a .45 caliber revolver. They arrived at Emerald Bay Apartments in Charlotte; it was between 8:00 and 8:30 p.m. Burris pointed out the dealer's apartment but did not exit the vehicle. Friday and defendant went to the dealer's door. Defendant knocked, and Friday stood to one side ready to charge the door if it was opened; however, no one answered. Friday and defendant returned to the vehicle, and the three rode away, intending to return within minutes. Upon their return, Friday and defendant again went to the apartment door but, again, received no answer. Back at the vehicle, as they prepared to leave, the three spotted two teenage girls standing at the opposite end of the apartment complex.

According to defendant, he was sitting in the backseat, Burris was in the front passenger seat, and Friday was the driver. As they pulled up next to the girls, Burris asked if the girls knew the drug dealer they were trying to find. While he engaged in small talk, Burris got out of the car, then took out his gun and pointed it at the girls.

A neighbor heard a young woman's voice and looked out of her apartment window to see what was happening. According to the neighbor, two girls, seventeen year old T.L. and fifteen year old R.C., were standing beside a grey or silver 1980's model Nissan Sentra, and a black man was standing in front of them with a silver handgun. The neighbor overheard the man tell the girls to get into the car. He pulled the front passenger seat back, the girls got into the back seat, the man got into the front passenger seat, closed the door, and the car drove off.

Defendant testified he was seated behind the driver, the two girls were seated beside him, and Burris was the front passenger. According to defendant, Burris turned around, "had a gun on [the girls,]" and instructed defendant to "go ahead and get that from them." Defendant took jewelry from R.C., and T.L. handed her necklace to Burris.

Friday drove toward Mount Holly then turned off onto Exchange Street and ultimately onto an unlit gravel road which ran beside a warehouse before coming to a dead end. Burris testified that the girls "were crying, asking — begging for their life, [sic] hysterical . . . ."

Defendant testified that Burris exited the vehicle, grabbed the girl nearest the door, pulled her from the backseat, then walked with her

out of sight, toward a wooded area. Friday exited the driver's seat, pointed his gun toward the back seat, and ordered the second girl out. Defendant testified that she grabbed a hold of him and said, "Don't let nothing happen to me." Defendant responded, "Ain't nothing going to happen to you," before defendant "grabbed her and pulled her out of the car."

Defendant testified that Friday ordered the girl to undress and perform oral sex on defendant while Friday forcibly engaged her in intercourse. Defendant testified that if he had not cooperated Friday "[p]robably [sic] shot me out there." "[M]y life was in danger. I knew he would have shot me. . . . [H]e got a gun on me and I know he [sic] trigger happy[.]"

After the sex acts, Friday grabbed the girl and took her toward the woods. Defendant returned to the backseat of the vehicle. Sitting there, defendant heard four shots. When Friday and Burris returned, defendant testified that Friday tapped defendant on his forehead with a gun, and said, "Only us three know about it. . . . If you get out and you say something . . . I'm going to burn you next, we're going to burn you next." Friday, Burris, and defendant then drove away. On the way to Mount Holly, Friday stopped at a convenience store while defendant went in and bought alcoholic beverages for each of them. The three returned to Mount Holly and spent the night at the home of Friday's girlfriend. The next morning, Friday dropped defendant off near his home. At the time of trial, in July 2008, defendant testified that he had seen Friday only two times in the fifteen years since the night of 2 June 1993.

On 8 June 1993, Detective Milton Harris, then a field training officer with the Charlotte Police Department, responded to a 9-1-1 call reporting two bodies in a field off of 1420 Exchange Street. When Det. Harris arrived at the scene, he discovered the unclothed, partially decomposed bodies of T.L. and R.C.

On 5 April 2005, defendant was indicted on two counts of first-degree kidnapping, two counts of robbery with a dangerous weapon, two counts of first-degree sexual offense, and two counts of murder. A trial before a jury in Mecklenburg County commenced on 21 July 2008 at the conclusion of which, the jury found defendant guilty of two counts of first-degree kidnapping, two counts of robbery with a dangerous weapon, one count of first-degree sexual offense, and two counts of first-degree felony murder premised on first-degree kidnapping and robbery with a dangerous weapon. Defendant was sen-

tenced to life imprisonment for each first-degree murder and first-degree sexual offense and twelve years for each first-degree kidnapping, all to be served consecutively. Judgment was arrested on the two convictions for robbery with a dangerous weapon. Defendant appeals.

---

Defendant raises six issues on appeal: whether the trial court erred by (I & II) refusing to instruct the jury on duress; (III) informing defendant that anything he said at the suppression hearing could be used against him at trial; (IV) denying defendant's motions for a mistrial; (V) allowing the prosecutor to assert during closing arguments that defendant was untruthful; (VI) failing to correct the prosecutor when the prosecutor informed the jury of the law on acting in concert.

## I & II

[1] Defendant argues that the trial court erred by refusing to instruct the jury on duress. We disagree.

"In order to have the court instruct the jury on [a] defense, the defendant must present some credible evidence on every element of the defense." *State v. Smith*, 152 N.C. App. 29, 39, 566 S.E.2d 793, 800 (2002) (citation omitted). "In order to successfully invoke the duress defense, a defendant would have to show that his actions were caused by a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act." *State v. Cheek*, 351 N.C. 48, 61-62, 520 S.E.2d 545, 553 (1999) (citation and quotations omitted). Although, in North Carolina, duress is not a defense to murder, it is an affirmative defense to kidnapping and robbery. *Id.* at 61, 520 S.E.2d at 553 (citation omitted). "Duress, however, cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm." *State v. Brown*, 182 N.C. App. 115, 118, 646 S.E.2d 775, 778 (2007) (citation omitted). "To constitute a defense . . . the coercion or duress must be present, imminent or impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done." *Smith*, 152 N.C. App. at 39, 566 S.E.2d at 800 (brackets omitted).

In *Smith*, we considered whether a trial court erred in denying defendant's request to instruct the jury on the defense of duress as a matter of law. Therein the evidence showed the defendant had ample opportunity to avoid participation in a burglary and robbery

"without undue exposure to death or serious bodily harm." *Id.* at 40, 566 S.E.2d at 801.

> [The] [d]efendant stated that he knew Moore was going to Ms. Todd's house to get money. Rather than flee, [the] defendant sat in the van while Moore kicked in the kitchen door and went inside. [The] [d]efendant himself then went inside and witnessed the stabbing. While Moore was tying up the victim, [the] defendant did not leave. Instead, he stood and watched until Moore came over to him and, with a knife, threatened to kill [the] defendant and his family. [The] [d]efendant made no attempt to leave while they disposed of the body, and then assisted Moore in taking the guns and jewelry. Finally, he made no attempt to contact the police or surrender the stolen goods, but instead sold them. Accordingly, [the] defendant's evidence fails to establish the defense of duress . . . .

*Id.*

Here, defendant testified that he voluntarily accompanied Burris and Friday to participate in taking drugs from an unarmed drug dealer with the use of firearms and that, while in the apartment complex, did not object and did not attempt to exit the vehicle as Burris forced two teenage girls into the car. In the vehicle, defendant took jewelry from one girl while Burris pointed a gun at them. Although, in his testimony, defendant stated that Friday was "trigger happy," defendant did not, prior to the shots being fired that resulted in the death of the two girls, indicate that any coercive measures were directed toward him. Defendant's testimony regarding his fear of Friday, which he attempts to frame as indicative of coercion or duress, actually only shows threats made by Friday after commission of the acts of kidnapping, robbery, sexual assault and murder. Thus, viewed in a light most favorable to defendant, his testimony does not evidence "a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act." *Cheek*, 351 N.C. at 61-62, 520 S.E.2d at 553 (citation omitted). Where defendant begins to participate in a crime or series of crimes as a willing participant, later threats do not retroactively allow him a defense of duress. *See Smith*, 152 N.C. App. at 39-40, 566 S.E.2d at 800-01. Therefore, we hold the trial court did not err in denying defendant's request for a jury instruction on duress. Accordingly, defendant's assignments of error are overruled.

STATE v. SANDERS

[201 N.C. App. 631 (2010)]

## III

Defendant argues the trial court erred by informing defendant at a suppression hearing that his testimony could be used against him at trial. Defendant argues that as a result, the waiver of his right to testify during the suppression hearing was not knowing, voluntary, or intelligent in violation of his Fifth and Fourteenth Amendment due process rights under the United States Constitution. We dismiss this argument.

> In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection or motion.

N.C. R. App. P. 10(b)(1) (2008). "The only exception is when a defendant claims plain error . . . ." *State v. Maness*, 363 N.C. 261, 273, 677 S.E.2d 796, 804 (2009) (internal citations and quotations omitted). "[A] constitutional issue not raised at trial will generally not be considered for the first time on appeal." *Id.* at 279, 677 S.E.2d at 808 (citations omitted).

Here, on appeal, defendant argues that the trial court violated defendant's Fifth and Fourteenth Amendment due process rights by erroneously instructing him that his suppression hearing testimony could be used against him before a jury. Thus, defendant argues, the waiver of his right to testify during the suppression hearing was not knowing, intelligent, and voluntary. This constitutional argument was not presented to the trial court; therefore, we hold this argument is not properly before us. *See* N.C. R. App. P. 10(b)(1). Accordingly, defendant's assignments of error in support of this argument are dismissed.

## IV

[2] Next, defendant argues that the trial court erred by denying defendant's motion for a mistrial after the State twice violated the trial court's order forbidding any mention of polygraph examinations. We disagree.

"Whether a motion for mistrial should be granted is a matter addressed to the sound discretion of the trial judge. A mistrial is

appropriate only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict." *State v. Harris*, 323 N.C. 112, 125, 371 S.E.2d 689, 697 (1988) (citation omitted). Because polygraph results are inherently unreliable, our Supreme Court has held that "such evidence is inadmissible in any criminal or civil trial." *State v. Willis*, 109 N.C. App. 184, 192, 426 S.E.2d 471, 473 (1993). Apart from objections to the inherent unreliability of the test, "[t]he Court also was disturbed by the possibility that the jury may be unduly persuaded by the polygraph evidence." *State v. Singletary*, 75 N.C. App. 504, 506, 331 S.E.2d 166, 168 (1985) (citing *State v. Grier*, 307 N.C. 628, 300 S.E.2d 351 (1983)). Although admission of polygraph test results may serve as the basis for reversal on appeal, not every reference to a polygraph test will necessarily result in prejudicial error. *Willis*, 109 N.C. App. 184, 192, 426 S.E.2d 471, 473 (citations omitted).

Here, the State filed a pre-trial Motion *In Limine* Concerning Polygraph Examination. In said motion, the State included the following averments:

> 2. As part of the investigation, Myron Burris agreed to submit to a polygraph examination. The examination was conducted on July 11, 1994 and the results indicated that he failed the polygraph.
>
> . . .
>
> [Pursuant to *State v. Grier*, 307 N.C. 628 (1983) and *State v. Fleming*, 350 N.C. 109 (1999)] the State moves this Court to preclude the defense from any and all inquiry, evidence, showing and / or statement regarding Myron Burris's or any other individual's participation in the polygraph examination . . . .

The trial court orally granted the State's motion.

At trial, Burris testified for the State. During his testimony, the trial court admitted into evidence an audio recording and transcript of his interview with law enforcement on 27 December 2005. Following the admission of the recording and transcript, the State introduced a copy of Burris' nonattribution agreement, also signed 27 December 2005, which Burris described as a form agreement he signed acknowledging that he would give a true statement. The nonattribution agreement included the following statement: "4) Information provided by Mr. Burris pursuant to this Agreement may be verified by polygraph examination or any other method chosen by the

State.". In addition, the trial court also admitted, absent objection, and published to the jury an audio recording and transcript of Burris' 17 May 2004 interview with F.B.I. Special Agent Raymond Duda.

During the 17 May 2004 interview, Burris engaged in the following discussion:

FBI:     Did you take a polygraph back then?

Burris:  Yes.

FBI:     Do you remember who gave you the polygraph? Where . . . where did the polygraph occur?

Burris:  At Brown Creek Corrections.

FBI:     Oh, Brown Creek?

Burris:  Yeah.

FBI:     Did they tell you how . . . how you . . . how you did on the polygraph?

Burris:  Uh, no they didn't . . . they didn't say nothing about it. They just . . . they just left and I hear from them eight years later.

After publication to the jury, defendant argued that the admission of the nonattribution agreement, with its unredacted reference to a polygraph examination, opened the door to a cross-examination of Burris on the issue of the polygraph examination.

The trial court observed that according to the nonattribution agreement the information provided by Burris could be verified by the State's choice of methods but the agreement gave no indication Burris took or passed a polygraph exam. Moreover, in his 17 May 2004 interview, though Burris acknowledged that he took a polygraph, he stated that he was not made aware of the results. On those grounds, defendant's request to cross-examine Burris on the issue of the polygraph examination was denied; however, the trial court inquired as to whether defendant would like the jury to be instructed that the proffer of information regarding the polygraph was not competent evidence for their consideration and was to be disregarded. Defendant declined the instruction. Instead, defendant made a motion to have the 17 May 2004 statement stricken and an instruction given that the jury was not to consider any of that information, as well as a motion for a mistrial. Defendant's motions were denied. We hold that the trial

court did not abuse its discretion in denying defendant's motion for a mistrial. While we disapprove of the State's actions in submitting to the jury unredacted exhibits containing references to a polygraph examination, such exhibits did not contain any evidence of the results of the polygraph examination. *See Harris,* 323 N.C. 112, 371 S.E.2d 689 (holding that the impropriety in mentioning the defendant was asked if he would take a polygraph was not so egregious as to render the jury incapable of an impartial verdict); *compare State v. Moose,* 115 N.C. App. 707, 446 S.E.2d 112 (1994) (granting new trial where prosecutor deliberately inquired whether the defendant was offered a polygraph in direct contravention of a trial court order to refrain from any mention of a polygraph exam because "the chance of prejudice [was] so great."). Accordingly, defendant's assignments of error are overruled.

## V

**[3]** Next, defendant argues that the trial court erred by failing to intervene *ex mero motu* when, during closing arguments, the prosecutor asserted that defendant was lying. We disagree.

"The arguments of counsel are left largely to the control and discretion of the trial judge, and counsel will be granted wide latitude in the argument of hotly contested cases." *State v. Ocasio,* 344 N.C. 568, 579, 476 S.E.2d 281, 287 (1996) (citation omitted). "The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*" *State v. Jones,* 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted).

> To constitute reversible error: the prosecutor's remarks must be both improper and prejudicial. Improper remarks are those calculated to lead the jury astray. Such comments include references to matters outside the record . . . . Improper remarks may be prejudicial either because of their individual stigma or because of the general tenor of the argument as a whole.

*State v. Nguyen,* 178 N.C. App. 447, 457, 632 S.E.2d 197, 204 (2006) (citation omitted). "In determining whether the prosecutor's argument was grossly improper, the Court must examine the argument in the context in which it was given and in light of the overall factual circumstances to which it refers." *Ocasio,* 344 N.C. at 580, 476 S.E.2d at 288 (citation omitted).

Here, the prosecutor stated the following:

> You can look at that statement and when you do you know that when Detective Ward got up there on the stand and said we didn't believe him, you can see why, because it's in that statement. He was lying. . . . But later he found out that this statement means he's guilty of kidnapping, robbery, sex offense and murder. What can he do? Well, somehow he's got to get rid of this statement, this statement that he gave of his own free will.
>
> . . .
>
> He's had four year[s], ladies and gentlemen, to think about what he would say. He's had access to all the [d]iscovery, the complete investigation. And he used that to craft this story because that's what he told you when he took the stand, he told you a story.

After reviewing the record and the context of the prosecutor's argument, we hold that the comments were not so grossly improper as to allow a finding that the trial court committed reversible error by failing to intervene *ex mero motu*. *See Jones*, 355 N.C. at 133, 558 S.E.2d at 107. Accordingly, defendant's assignments of error are overruled.

## VI

[4] Next, defendant argues the trial court abused its discretion by failing to sustain defendant's objection to the prosecutor's characterization of the law on acting in concert during closing arguments. We disagree.

"The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106 (citations omitted). ·

> When applying the abuse of discretion standard to closing arguments, this Court first determines if the remarks were improper. . . . [I]mproper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others. Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court.

*Id.* at 131, 558 S.E.2d at 106 (citation omitted). "Incorrect statements of law in closing arguments are improper . . . ." *State v. Ratliff,* 341 N.C. 610, 616, 461 S.E.2d 325, 328 (1995).

Here, the prosecutor made the following statements during closing arguments:

[Prosecutor]:   I told you all that this is not a conspiracy case. We don't have to prove that these men joined up together for a common purpose and that they intended the purpose to be carried out. That's conspiracy.

[Defense]:      Objection.

The Court:      Overruled.

. . .

[Prosecutor]:   Joining together doesn't have to be through words, it can be through actions. . . . These men made an agreement earlier in the evening to commit the robbery. When that didn't work out for them, they picked a new target and they joined together to put those girls in the car. They joined together to kidnap them . . .[b]y virtue of doing that, again, under our law, that is acting in concert.

The trial court gave the following instruction to the jury with respect to the doctrine of acting in concert:

Court:   For a person to be guilty of a crime, it is not necessary that he personally do all of the facts necessary to constitute the crime. If two or more persons join in the common purpose to commit a crime, each of them, if actually or constructively present is not only guilty of that crime if the other person commits the crime but is also guilty of any other crime committed by the other in pursuance of the common purpose to commit that crime or as a natural or probable consequence thereof.

We hold this instruction is consistent with North Carolina law and cures any prejudice from the prosecutor's comments. *See State v. Roache,* 358 N.C. 243, 306, 595 S.E.2d 381, 421 (2004) (the doctrine of acting in concert "allows a defendant acting with another person for a common purpose of committing some crime to be held guilty of a

[crime] committed in the pursuit of that common plan even though the defendant did not personally commit the [crime]."). Accordingly, defendant's assignments of error are overruled.

No prejudicial error.

Judges WYNN and HUNTER, Robert C., concur.